580 F.2d 590
 188 U.S.App.D.C. 327
 MCI TELECOMMUNICATIONS CORPORATION, Microwave
Communications, Inc., and N-Triple-C Inc., Petitioners,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
American Telephone and Telegraph Company, United States
Independent Telephone Association, Data
Transmission Company (DATRAN), and
Southern Pacific
Communications
Company,
Intervenors.
 No. 75-1635.
 United States Court of Appeals,
District of Columbia Circuit.
 April 14, 1978.
Rehearing Denied May 8, 1978.
 
 Michael H. Bader, William J. Byrnes, Kenneth A. Cox, and Raymond C. Fay, Washington, D. C., were on the pleadings for petitioners.
 Robert R. Bruce, Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, and John E. Ingle, Counsel, F. C. C., Washington, D. C., were on the pleadings for respondents.
 Paul J. Berman and Michael Boudin, Washington, D. C., and F. Mark Garlinghouse, New York City, were on the pleadings for intervenor American Tel. and Tel. Co.
 Before WRIGHT, Chief Judge, and TAMM and WILKEY, Circuit Judges.
 Opinion for the court filed by Chief Judge WRIGHT.
 J. SKELLY WRIGHT, Chief Judge:
 
 
 1
 Petitioners here, MCI Telecommunications Corporation, Microwave Communications, Inc., and N-Triple-C Inc. (hereinafter, collectively, MCI), request this court to issue an order directing the Federal Communications Commission (FCC) and the American Telephone & Telegraph Company (AT&T) to comply with our mandate in MCI Telecommunications Corp. v. FCC, 182 U.S.App.D.C. 367, 561 F.2d 365 (1977), Cert. denied, 434 U.S. 1040, 98 S.Ct. 781, 54 L.Ed.2d 790 (1978) (hereinafter Execunet ). This motion by MCI was prompted by a declaratory ruling issued by the Commission, at the request of AT&T, on February 23, 1978, holding that AT&T is under "no obligation" to provide the local physical interconnections necessary for MCI's Execunet service.[1] MCI argues that this ruling is inconsistent with and violative of our Execunet decision, and that under our mandate AT&T Is required to provide interconnections for Execunet. For the reasons set forth below, we agree, and we order the parties to comply with our mandate.
 
 I. BACKGROUND
 
 2
 The motion to direct compliance before us now is the most recent stage in the long series of proceedings and litigation in which MCI has attempted to secure and preserve its authority to offer Execunet service.[2] Since the seminal FCC Specialized Common Carrier decision, Specialized Common Carrier Services, 29 FCC2d 870 (1971), Aff'd sub nom. Washington Utilities & Transportation Com'n v. FCC, 513 F.2d 1142 (9th Cir.), Cert. denied, 423 U.S. 836, 96 S.Ct. 62, 46 L.Ed.2d 54 (1975) (hereinafter Specialized Carrier ), MCI has met with almost continuous resistance from AT&T in its efforts to provide communications services. We had thought that this process finally culminated in our Execunet decision upholding MCI's authority to offer Execunet pending further rulemaking by the Commission. Now, however, we are faced with a new effort by AT&T, with the approval of the Commission, to arrest the development of Execunet service, and the question for immediate disposition is whether protection of the integrity of our Execunet mandate requires that this new effort be terminated through an order directing compliance with our mandate. We believe it does.
 
 
 3
 Since the course of all of these earlier proceedings is set out in some detail in our Execunet decision,[3] our purpose here is only to outline briefly the background necessary to consideration of this motion. In Specialized Carrier, supra, the Commission sought to determine by rulemaking "(w)hether as a general policy the public interest would be served by permitting the entry of new carriers in the specialized communications field * * *." 29 FCC2d at 878. The Commission answered that question affirmatively,[4] but did not seek to define precisely the boundaries of "the specialized communications field."[5]
 
 
 4
 Specialized Carrier served as the basis for the Commission's later grants, under 47 U.S.C. § 214 (1970), of facilities authorizations to carriers, including MCI, to provide microwave communications services. AT&T, however, refused to provide interconnections necessary for the specialized carriers to furnish these services. This refusal led MCI to seek and secure from the Commission both a cease and desist order against AT&T and an affirmative order that AT&T was required to provide any physical connections "essential" to the rendition of "all" the services which any of the specialized common carriers "presently or hereafter" are authorized to offer. Bell System Tariff Offerings, 46 FCC2d 413 (1974), Aff'd sub nom. Bell Telephone Co. of Pennsylvania v. FCC, 503 F.2d 1250 (3d Cir. 1974), Cert. denied, 422 U.S. 1026, 95 S.Ct. 2620, 45 L.Ed.2d 684 (1975).
 
 
 5
 MCI filed a tariff revision including rates for Execunet service in September 1974. That tariff was rejected by the Commission at the request of AT&T. MCI immediately sought a stay of the Commission's order pending judicial review. A stay was initially granted, then later modified in light of the opposition of the FCC and AT&T. As modified the stay permitted MCI to continue to serve its present customers but prohibited any solicitation of new customers or any expansion of service.[6] In seeking and securing this modification of the stay as well as in its opposition to the grant of the original stay AT&T forcefully argued that a broad stay would permit MCI to compete with AT&T's long distance service in high density, high profit areas, and that this would have a substantial adverse impact on AT&T and on the public interest. According to the pleadings filed in this court by AT&T, such competition would undermine AT&T's practice of determining long distance rates through cost averaging and would result in substantial increase in costs in low density areas.[7]
 
 
 6
 After an initial remand at the Commission's request for further proceedings on the merits, we reversed the FCC's rejection of the Execunet tariff. We held that under the Communications Act the tariff system provides the usual mechanism for initiation of new services to be provided on previously authorized facilities.[8] Under this mechanism a carrier files a tariff for the new service and, subject to a possible stated suspension period, is permitted to implement that service until and unless the Commission determines that the service is not in the public interest.[9] The only limitation on the carrier's ability to make use of tariff filings to initiate new services relevant to this case is found in Section 214(c) of the Act, 47 U.S.C. § 214(c) (1970), which permits the Commission, in granting facilities authorizations, to limit the services which may be provided on facilities which it authorizes.[10]
 
 
 7
 The Commission argued in Execunet that its Specialized Carrier decision implicitly restricted the facilities authorizations of specialized carriers to "private line" services, that Execunet is not such a "private line" service, and that MCI therefore could not implement this service through a tariff filing. In support of its position the Commission emphasized that its analysis of competitive effects in Specialized Carrier assumed that the specialized carriers would be limited to offering "private line" services.[11]
 
 
 8
 We rejected the Commission's arguments, holding that Section 214 requires an affirmative determination to restrict a carrier's facilities authorization, and that no such determination was made in Specialized Carrier. In reaching our conclusion we placed emphasis on the Commission's staff report which formed the basis for the Specialized Carrier decision. As to the competition argument, we found that the staff report "ruminated more broadly (than the Commission suggested) on the issues posed by revenue diversion and it appeared highly skeptical of the validity of AT&T's overall argument." 182 U.S.App.D.C. at 380, 561 F.2d at 378. Further, we noted that the staff report "dealt explicitly with the question of how the Commission ought to deal with possible adverse impacts of service offerings other than those which were before the Commission in the Specialized Common Carrier decision." Id., 182 U.S.App.D.C. at 380-381, 561 F.2d at 378-379. We found that "(t)he undeniable import of the staff's analysis is that questions related to the future impact of specialized carrier service offerings other than those immediately at hand in the Specialized Common Carrier case should be resolved in other proceedings in tariff proceedings, upon license renewal, or by future rulemaking." Id., 182 U.S.App.D.C. at 381, 561 F.2d at 379.
 
 
 9
 AT&T, as well as the Commission, petitioned for certiorari, arguing, Inter alia, as they had before this court, that our decision would result in vigorous competition over high density routes, with potentially adverse effects on the public interest as well as on AT&T.[12] Certiorari was denied on January 16, 1978.[13]
 
 
 10
 Hours after the Supreme Court's denial of certiorari AT&T announced its intention to cease providing any additional interconnections for Execunet or similar services, and filed with the Commission a petition for declaratory ruling that it was under "no obligation" to furnish MCI or any other specialized carriers with any "additional" physical connections for Execunet-type services. The Commission considered AT&T's petition on an expedited basis, and on February 23, 1978 it adopted a declaratory ruling in substantial accord with AT&T's request.[14]
 
 
 11
 II. THE COMMISSION'S DECLARATORY RULING IS INCONSISTENT WITH THE Execunet MANDATE
 
 
 12
 The local physical interconnections which AT&T now refuses to provide for Execunet service are admittedly essential to MCI's ability to offer that service. As a result, AT&T's refusal to provide "additional" connections, upheld in the Commission's declaratory ruling, means that MCI is in effect no better off than it was during the entire course of the litigation in this court: notwithstanding our favorable decision, it is unable to expand Execunet. Moreover, nothing in the Commission's ruling, or in AT&T's request, establishes any legal basis for a greater interconnection obligation on AT&T with respect to maintenance of physical connections already in place than with respect to "additional" connections, with the result that MCI might well find itself in the near future unable even to provide Execunet to its existing customers.[15]
 
 
 13
 Having successfully litigated the question of its right to provide Execunet service, MCI certainly has good cause to feel that this subsequent turn of events engineered by the Commission and AT&T is strikingly unfair. Of course, as AT&T and the Commission so vigorously argue, litigation in the courts does not always provide the victor with all that he might wish, or with all that he expected or thought he had won. But the fact of the matter is that our Execunet decision Did clearly contemplate by virtue of AT&T 's representations and actions that AT&T was required to provide interconnections for Execunet service.
 
 
 14
 Until the Supreme Court denied certiorari in Execunet, AT&T provided MCI with the interconnections necessary for Execunet service without any form of protest or objection. Never in the proceedings before this court did AT&T even suggest that it was not required to provide these connections, or that the question of MCI's authority to provide or expand its Execunet service was, as a practical matter, of no consequence since AT&T could and would refuse to provide the essential interconnections should we decide in MCI's favor. Quite to the contrary, in securing the modification of our original stay, in its briefs and arguments to this court, and in its petition for certiorari, AT&T consistently emphasized that a decision in favor of MCI Would lead to vigorous and adverse competition.[16] a result which would occur only if AT&T was required to provide the necessary interconnections for Execunet. AT&T expected and encouraged this court to take account of these representations in reaching our decisions in the Execunet matter; certainly, it did not assume that in so doing we would at the same time ignore the underlying assumptions supporting the claims of competition. Indeed, even now AT&T does not deny that it is required to provide interconnections for existing Execunet service; it contends Only that is not required to provide any "additional" connections,[17] notwithstanding its earlier representations necessarily assuming the contrary, upon which our Execunet decisions were premised, as well as the absence of any apparent legal basis for distinguishing existing connections from additional ones.
 
 
 15
 In view of this background, AT&T's current refusal, with the approval of the Commission, to provide interconnections to MCI does not simply raise questions of fairness Vis-a-vis MCI; it also raises questions as to the propriety of allowing respondents here to renounce a position and obligation which they assumed throughout the course of the Execunet proceedings. But we need not rest our grant of MCI's compliance motion on the practical consequences involved here or on considerations of fairness and estoppel. For while it is true, as AT&T strongly emphasizes, that our Execunet decision is not addressed explicitly to the interconnection issue or to AT&T's obligation to provide interconnection[18] a fact which is hardly surprising, given the background of this case and the apparent assumption by all the parties, as well as this court, that such an obligation was in force it is also true that our analysis and decision of the Execunet case is plainly inconsistent with the analysis and ruling of the Commission on February 23, 1978 holding AT&T under "no obligation" to provide interconnections for Execunet.
 
 
 16
 In reaching this conclusion the Commission addressed its analysis to two questions: whether the Commission had previously directed AT&T to provide these services pursuant to an order under Section 201(a) of the Communications Act; and, if not, whether AT&T is under an obligation to provide interconnection apart from a Section 201(a) order. While serious questions have been raised by the Department of Justice as to the correctness of the Commission's disposition of the second question,[19] we need not address these doubts here, since it is the Commission's analysis and resolution of the first question which gives rise to the inconsistency with our Execunet mandate. For in concluding that its prior orders do not require AT&T to provide interconnections for Execunet, the Commission construes narrowly and restrictively the very same issues and decisions which were broadly construed by this court in Execunet.
 
 
 17
 For purposes of the Commission's first question, the critical interconnection order is the Bell System Tariff Offerings order, Supra, requiring AT&T to provide interconnection for "all" of the services which any of the specialized carriers "presently or hereafter" are authorized to offer. In its declaratory ruling the Commission sought to construe this order as limited to "presently or hereafter authorized Private line service," In the Matter of Petition of AT&T for Declaratory Ruling and Expedited Relief, FCC 78-142, Memorandum, Opinion and Order, Adopted February 23, 1978, Released February 28, 1978, P 58 (hereinafter FCC Declaratory Ruling), allegedly relying on a decision of the Third Circuit to that effect. See infra. In the very next paragraph of its decision, however, the Commission recognized "that the Specialized Carrier decision encompassed specialized communication services other than those which theretofore had been described as 'private line services' " and acknowledged that "private line" had emerged as shorthand for the broader term "specialized communication service" because of the particular context in which the interconnections issues were most frequently raised. Id. P 259. Thus the Commission continued:
 
 
 18
 We believe it is clear that the Specialized Common Carrier decision as well as our order in Bell System Tariff Offerings and the Court's decision in Bell Tel. Co. of Pennsylvania require interconnection for all Specialized interstate communication services, including switched digital services such as those developed by Datran. What is germane to the present proceeding, however, is a determination as to what services were explicitly Excluded from consideration in Specialized Common Carrier, Bell System Tariff Offerings, and Bell Tel. Co. of Pennsylvania. We believe it is clear that MTS and WATS services, and therefore services by other names which are the functional equivalent of MTS and WATS, were excluded from both the considerations and holdings of these proceedings. * * *
 
 
 19
 Id. (emphasis in original). Phrased in these terms the Commission's reasoning is wholly at odds with that of this court in Execunet. For in Execunet we held that MCI's facilities authorizations encompassed Execunet service Precisely because Specialized Carrier did not explicitly and affirmatively exclude this type of service from consideration. In relying on exactly the opposite conclusion to support its declaratory ruling, the Commission acts in direct and explicit contradiction to our Execunet decision.
 
 
 20
 The inconsistency between Execunet and the Commission's declaratory ruling persists at the more general level as well. The thrust of our entire opinion and decision in Execunet, derived in part from our reading of the Commission staff report, was that Specialized Carrier represented a broad decision by the Commission to allow carriers such as MCI to enter the market and compete with AT&T, subject only to later limitations based on public interest determinations in tariff or rulemaking proceedings.[20] In its February 23rd ruling, however, the Commission narrowly construed Bell System Tariff Offerings, which was based on Specialized Carrier, to exclude Execunet interconnections from those which AT&T was required to provide; and it relied on interconnection obligations as opposed to tariffs or rulemaking effectively to limit the services which MCI and other carriers were authorized to provide by the Specialized Carrier decision.
 
 
 21
 Both of these positions are clearly inconsistent with the basic themes of our Execunet decision. For the expansive interpretation of Specialized Carrier we advanced in Execunet clearly mandates an equally expansive view of the scope of the interconnection obligations of AT&T which were defined by that decision. And in fact the interconnection order which the Commission issued on the basis of Specialized Carrier, as well as its discussion of interconnection in Specialized Carrier itself,[21] reflected the broad reading of that decision to which we have adhered: as noted earlier, it required AT&T to furnish interconnection for all "presently or hereafter authorized" services provided by the specialized carriers.[22] Similarly, our emphasis on tariffs and ratemaking as the exclusive means for future limitations on the specialized carriers' development[23] clearly contemplated that the carriers would be free to expand their service offerings and would be afforded the necessary interconnections until and unless it was found that the public interest demanded otherwise. The Commission's narrow construction of AT&T's existing interconnection obligation is not only theoretically inconsistent with this position, but also means in practice that a specialized carrier Cannot implement new offerings until and unless it is able to establish that the public interest mandates the services[24] and that a new order should therefore be issued directing AT&T to provide interconnections. This twists the issues we contemplated in this case beyond recognition; it deliberately frustrates the purpose of the litigation, the basis on which it was presented by the parties, and the intended effect of our decree.
 
 
 22
 In our view, then, the only conclusion to the issues presented here which is consistent with our reasoning and holding in Execunet is that the Commission decisions in Specialized Carrier and Bell System Tariff Offerings impose upon AT&T an obligation to provide interconnections for Execunet. In holding otherwise in its February 23rd declaratory ruling, therefore, the Commission acted inconsistently with our Execunet mandate. And in refusing to provide these interconnections to MCI AT&T is acting inconsistently with the view of its legal obligations reflected in our Execunet decision.
 
 III. THE Bell Telephone DECISION
 
 23
 One final argument remains to be addressed. The Commission has asserted that the position it has taken in this action is mandated by the decision of the Third Circuit in Bell Telephone Co. of Pennsylvania v. FCC, supra, and that this position represents the only means by which the Commission can simultaneously comply with the decisions of the two circuits.[25] As we have already made clear, however, the Commission's February 23rd decision does not effectuate compliance with our Execunet decision. Nor can the Commission claim that it was required to decide as it did in order to comply with Bell Telephone. For in our view there is absolutely no conflict between the Execunet and Bell Telephone decisions; the latter in no way compels or even provides support for the Commission ruling that AT&T is under no obligation to provide interconnections for Execunet.
 
 
 24
 The interconnection orders under review in Bell Telephone were issued by the Commission after AT&T refused to provide to MCI the interconnections necessary for FX and CCSA service.[26] FX, a service similar to though somewhat more limited than Execunet, allows an individual in one state in effect to maintain a local phone in another state and thereby avoid making or receiving traditional long distance calls from that state. For example, an individual in Washington with FX can be reached by telephone subscribers in New York City and can himself reach New York City subscribers through a local loop in Washington, a Washington-New York interexchange line, and a business line in the New York City exchange area. CCSA, a Common Control Switching Arrangement, serves to link the various offices of a large company through switches on a local telephone company's premises.[27] In the orders being challenged in Bell Telephone the Commission had first concluded that its prior actions notably, its Specialized Carrier decision had imposed upon AT&T the obligation to provide FX and CCSA interconnections to MCI and other specialized carriers.[28] Lest its prior orders were not clear, however, the Commission again reviewed the interconnection question, concluding that "achievement of our objective that competition in the provision of interstate private line communications services be on a full, fair and nondiscriminatory basis requires the issuance of Broad interconnection orders. Our orders herein therefore make clear that Bell is to provide interconnection for All of the authorized services of the specialized carriers, including FX and CCSA." 503 F.2d at 1259, Quoting 46 FCC2d at 426-427 (emphasis added).
 
 
 25
 An essential question posed by AT&T's petition for review in Bell Telephone was whether the Commission's order was the first time that AT&T had been directed to provide FX and CCSA interconnections, or whether, as the Commission argued, AT&T's obligations to provide these connections were fixed by Specialized Carrier and the Bell Telephone orders merely represented the Commission's method of enforcing a previously announced mandate.[29] The Third Circuit adopted the Commission's view. The court noted that Specialized Carrier contained no specific reference to FX or CCSA, but it construed that decision broadly to include the services in question.[30] In so doing the Third Circuit decision provides strong support not conflicting authority for the similarly broad construction we accorded in Execunet to Specialized Carrier and to the Commission's Bell Telephone order. For just as the Third Circuit found Specialized Carrier sufficiently broad to include FX and CCSA service, notwithstanding the absence of specific references to these services, so too we have found that decision broad enough to encompass Execunet, notwithstanding the similar absence of specific references.[31]
 
 
 26
 Nonetheless, AT&T and the Commission, pointing to the Third Circuit's discussion of an overbreadth challenge, argue that that discussion forecloses the FCC from finding that AT&T is required to interconnect for Execunet under the Specialized Carrier and Bell Telephone orders.[32] We disagree. In Bell Telephone AT&T argued, Inter alia, that the order under review, by requiring it to provide "the interconnection facilities essential to the rendition of all of (the specialized carriers') presently or hereafter authorized interstate and foreign communications services," 503 F.2d at 1283, imposed an "Unbounded interconnection order." Id. at 1273 (emphasis in original). The court rejected this challenge and upheld the order, noting:
 
 
 27
 Were we to read the Commission's order in a vacuum, we would be inclined to agree with petitioner that the order is somewhat vague and, to a certain extent, overbroad. On its face, the order gives little guidance as to the types of services that A T & T will be required to provide "hereafter."
 
 
 28
 Nevertheless, we find it unnecessary to remand on this ground. Orders are not to be read in a vacuum, but rather must be read and interpreted in the context in which they appear. * * * Viewed in its entirety, the FCC's opinion in Docket 19896 operates to preclude AT&T from treating its Long Lines Department and its affiliates differently than it treats the specialized common carriers. * * * As we read the order, the FCC has required A T & T to provide to the specialized carriers those (interconnection) elements of private line services which A T & T supplies to its affiliates and furnishes to customers through its Long Lines Department. * * *
 
 
 29
 Id. at 1273-1274.
 
 
 30
 The question presented by the arguments of the FCC and AT&T here is whether the above paragraphs clearly limit the Bell Telephone interconnection order so as to exclude Execunet, which the Commission has determined is not a "private line" service.[33] In concluding that it does not, we think two factors are of importance. First, the overbreadth and vagueness with which the Third Circuit was concerned were directed not to any uncertainty as to what services the specialized common carriers themselves would provide, but rather to the fact that "(o)n its face, the order gives little guidance as to The types of services that AT&T will be required to provide 'hereafter.' " Id. (emphasis added). Such concerns are not involved in this case, however, since Execunet apparently does not call for any novel forms of service from AT&T, but rather requires virtually the same forms of interconnection as are provided for FX.[34] Second, and more important, the Commission itself has not found or suggested that the court's Bell Telephone decision in fact limits AT&T's interconnection obligations to "private line" services, as that term is currently defined by the Commission. Rather, the Commission, notwithstanding its emphasis on the Third Circuit's use of the term "private line" as a limiting factor in its decision, itself recognizes that Bell Telephone imposes upon AT&T an obligation to provide interconnection for services not traditionally considered "private line" and that it did so at the time it was entered. To quote the Commission once again: "We believe it is clear that the Specialized Common Carrier decision as well as our order in Bell System Tariff Offerings and the Court's decision in Bell Tel. Co. of Pennsylvania require interconnection for all Specialized interstate communication services * * *." FCC Declaratory Ruling, Supra, at P 59 (emphasis in original). Having made this determination, and having explained the Third Circuit's use of "private line" as a shorthand or abbreviated term, the Commission then formulates the final and dispositive question for resolution as that of "what services were explicitly Excluded from consideration in Specialized Common Carrier, Bell System Tariff Offerings, and Bell Tel. Co. of Pennsylvania." Id. (emphasis in original). And that is precisely the question we addressed and answered in Execunet, finding that Execunet services were Not explicitly excluded.
 
 
 31
 The Commission's analysis of Bell Telephone, then, far from providing authority which conflicts with our construction of the Execunet decision, culminates finally in the very question which was not addressed in Bell Telephone but which was answered in Execunet. Neither the Commission nor AT&T is now free to choose to ignore the answer given by this court, in lieu of one more favorable to their position we rejected in Execunet.
 
 
 32
 Motion granted.
 
 
 
 [1]
 In the Matter of Petition of American Telephone and Telegraph Company for a Declaratory Ruling and Expedited Relief, FCC 78-142, Memorandum, Opinion and Order, Adopted February 23, 1978, Released February 28, 1978 (hereinafter FCC Declaratory Ruling)
 
 
 [2]
 With Execunet a subscriber with a push-button telephone is able to reach any telephone in a distant city served by MCI by dialing a local MCI number followed by an access code and the number in the distant city. Execunet subscribers are billed on a time and distance basis for each call, subject to a monthly minimum. See MCI Telecommunications Corp. v. FCC, 182 U.S.App.D.C. 367, 369, 561 F.2d 365, 367 & n.3 (1977), Cert. denied, 434 U.S. 1040, 98 S.Ct. 781, 54 L.Ed.2d 790 (1978) (hereinafter Execunet ); MCI Telecommunications Corp., 60 FCC2d 25, 26 n.1 (July 13, 1976)
 
 
 [3]
 See Execunet, supra note 2, 182 U.S.App.D.C. at 369-375, 561 F.2d at 367-373. See also Bell Telephone Co. of Pennsylvania v. FCC, 503 F.2d 1250, 1254-1263 (3d Cir. 1974), Cert. denied, 422 U.S. 1026, 95 S.Ct. 2620, 45 L.Ed.2d 684 (1975)
 
 
 [4]
 As to this question the Commission concluded:
 (T)here is a public need and demand for the proposed facilities and services and for new and diverse sources of supply, competition in the specialized communications field is reasonably feasible, there are grounds for a reasonable expectation that new entry will have some beneficial effects, and there is no reason to anticipate that new entry would have any adverse impact on service to the public by existing carriers such as to outweigh the considerations supporting new entry. We further find and conclude that a general policy in favor of the entry of new carriers in the specialized communications field would serve the public interest, convenience, and necessity.
 Specialized Common Carrier Services, 29 FCC2d 870, 920 (1971), Aff'd sub nom. Washington Utilities & Transportation Com'n v. FCC, 513 F.2d 1142 (9th Cir.), Cert. denied, 423 U.S. 836, 96 S.Ct. 62, 46 L.Ed.2d 54 (1975) (hereinafter Specialized Carrier ). The Commission went on to address the question of "the appropriate means for local distribution of the proposed services," Notice of Proposed Rulemaking, 24 FCC2d 318 (1970), concluding:
 
 
 [157]
 We reaffirm the view expressed in the Notice (paragraph 67) that established carriers with exchange facilities should, upon request, permit interconnection or leased channel arrangements on reasonable terms and conditions to be negotiated with the new carriers, and also afford their customers the option of obtaining local distribution service under reasonable terms set forth in the tariff schedules of the local carrier. Moreover, as there stated, "where a carrier has monopoly control over essential facilities we will not condone any policy or practice whereby such carrier would discriminate in favor of an affiliated carrier or show favoritism among competitors." In view of the representations of AT&T and GT&E in this proceeding, upon which we rely, and the self-interest of other independent telephone companies in not losing potential new business, there appears to be no need to say more on this question at this time. Should any future problem arise, we will act expeditiously to take such measures as are necessary and appropriate in the public interest to implement and enforce the policies and objectives of this Decision
 Specialized Carrier, supra, 29 FCC2d at 940 (emphasis added; footnote omitted).
 
 
 [5]
 See Execunet, supra note 2, 182 U.S.App.D.C. at 373, 381, 561 F.2d at 371, 379 n.68 ("to the extent that any definition of a specialized common carrier emerges from the Commission's discussion, that definition appears to be simply that a specialized carrier is any carrier that does not attempt to optimize its service offerings to the voice communications needs of the general public")
 
 
 [6]
 See Execunet, supra note 2, 182 U.S.App.D.C. at 371, 561 F.2d at 369 & n.18
 
 
 [7]
 See Memorandum of AT&T in Opposition to Petitioners' Motion for Stay Pending Review, July 14, 1975, at 44-47; Motion of AT&T to Dissolve or Modify the Stay and for Expedited Review, August 18, 1976, at 24-29
 
 
 [8]
 Execunet, supra note 2, 182 U.S.App.D.C. at 376, 561 F.2d at 374, Citing AT&T v. FCC, 487 F.2d 865, 870-881 (2d Cir. 1973)
 
 
 [9]
 The relevant tariff provisions are found in §§ 203-205 of the Communication Act, 47 U.S.C. §§ 203-205 (1970). See Execunet, supra note 2, 182 U.S.App.D.C. at 376, 561 F.2d at 374 n.44
 
 
 [10]
 Section 214(c) permits the Commission to "attach to the issuance of the certificate such terms and conditions as in its judgment the public convenience and necessity may require." 47 U.S.C. § 214(c) (1970). See Execunet, supra note 2, 182 U.S.App.D.C. at 378-379, 561 F.2d at 376-377 & n.56
 
 
 [11]
 Execunet, supra note 2, 182 U.S.App.D.C. at 379, 561 F.2d at 377 & n.58
 
 
 [12]
 AT&T Petition for Certiorari, MCI Telecommunications Corp. v. FCC (Sept. 1977), at 29-30 ("If the lower court's decision stands, the telephone companies will be threatened with a massive diversion of MTS traffic from the switched network. This diversion can occur at an extraordinary rate literally in a matter of months because the specialized carriers have thousands of intercity circuits in operation and they utilize existing local distribution facilities already in place. Past experience confirms the severity and speed of this threat."), Quoted in MCI Petition for Compliance before the FCC, at 7
 
 
 [13]
 434 U.S. 790, 98 S.Ct. 781, 54 L.Ed.2d 790 (1978)
 
 
 [14]
 The petition for a declaratory ruling was granted, and AT&T declared without obligation to interconnect, with respect to prior Commission orders, the provisions of the Communications Act, and the mandate of this court in Execunet. The petition was denied only "insofar as it requests a determination with respect to the scope of petitioner's interconnection obligations to specialized common carriers, if any, under the Sherman Act, the common law, or any federal or state statute other than the Communications Act." FCC Declaratory Ruling, Supra note 1, P 83
 
 
 [15]
 Indeed, the Commission's order does not even restrict its holding to "additional" connections: it concludes "that our prior Section 201(a) orders do not direct the petitioners to provide interconnection of facilities or services to any specialized common carrier to enable such a specialized common carrier to provide any service which is substantially equivalent to MTS or WATS." Id. P 79
 
 
 [16]
 See notes 7 & 12 Supra
 
 
 [17]
 See Opposition of AT&T to MCI Motion for an Order Directing Compliance With Mandate, MCI Telecommunications Corp. v. FCC (March 2, 1978), at 10
 
 
 [18]
 See id. at 12-14. See also Response of Federal Communications Commission to MCI Motion for an Order Directing Compliance With Mandate, MCI Telecommunications Corp. v. FCC (March 6, 1978), at 7 ("There was no mention of interconnection rights or obligations, because none of the parties had raised these questions either before the Commission or in the Court.")
 
 
 [19]
 See Comments of the United States Department of Justice, In the Matter of Petition of American Telephone and Telegraph Company for Declaratory Ruling and Expedited Relief, submitted as Appendix A to MCI Reply to Oppositions, MCI Telecommunications Corp. v. FCC (March 9, 1978), at 7, 9 (arguing, Inter alia, that "AT&T totally failed to make any factual showing of harm in its petition seeking to invoke Commission protection against competition in the intercity services market," as well as that "(r)ecent court decisions make it clear that local telephone companies, including AT&T subsidiaries, are affirmatively obliged to offer local interconnection or loop services to other carriers, including MCI, to facilitate lawful services")
 
 
 [20]
 Execunet, supra note 2, 182 U.S.App.D.C. at 380-381, 561 F.2d at 378-379. See --- F.2d at --- U.S.App.D.C. ---- - ---- Supra, 580 F.2d at 593 - 594
 
 
 [21]
 See note 4 Supra, quoting Specialized Carrier, 29 FCC2d at 940 ("established carriers with exchange facilities should, upon request, permit interconnection or leased channel arrangements on reasonable terms and conditions to be negotiated with the new carriers, and also afford their customers the option of obtaining local distribution service under reasonable terms set forth in the tariff schedules of the local carrier")
 
 
 [22]
 Bell System Tariff Offerings, 46 FCC2d 413 (1974), Aff'd sub nom. Bell Telephone Co. of Pennsylvania v. FCC, supra note 3
 
 
 [23]
 Execunet, supra note 2, 182 U.S.App.D.C. at 380-381, 561 F.2d at 378-379. See --- U.S.App.D.C. at ---- - ----, 580 F.2d at 592 - 594, Supra
 
 
 [24]
 Compare Execunet, supra note 2, 182 U.S.App.D.C. at 380-381, 561 F.2d at 374 ("it is well recognized that the tariff provisions of the Communications Act (Sections 203-205, 47 U.S.C. §§ 203-205), like the cognate sections of the Interstate Commerce Act * * *, embody a considered legislative judgment that carriers should in general be free to initiate and Implement new rates or services over existing communications lines unless and until the Commission, after hearing, determines that such rates or practices are unlawful, subject only to a limited period of suspension set out in the statute") (footnotes omitted; emphasis in original)
 
 
 [25]
 See FCC Declaratory Ruling, Supra note 1, PP 56, 61; Response of Federal Communications Commission, Supra note 18, at 20
 
 
 [26]
 See Bell Telephone Co. of Pennsylvania v. FCC, supra note 3, 503 F.2d at 1254-1259
 
 
 [27]
 Id. at 1254 n.4, quoting Bell System Tariff Offerings, supra note 22, 46 FCC2d at 418 & n. 5
 
 
 [28]
 Bell System Tariff Offerings, supra note 22, 46 FCC2d at 426-427. See also Letter from Bernard Straussburg, Chief of the Common Carrier Bureau, FCC, to AT&T, August 31, 1973 ("it is our view that, as requested by MCI, the associated Bell companies are required to permit interconnection or provide local channel arrangements to MCI"), Quoted in Bell Telephone Co. of Pennsylvania v. FCC, supra note 3, 503 F.2d at 1256
 
 
 [29]
 Bell Telephone Co. of Pennsylvania v. FCC, supra note 3, 503 F.2d at 1259
 
 
 [30]
 Id. at 1258-1260. In so doing the court emphasized the broad language the Commission itself employed in the Specialized Carrier proceeding. Id. at 1262-1263. See note 4 Supra, quoting Specialized Carrier, 29 FCC2d at 940; Execunet, supra note 2, 182 U.S.App.D.C. at 380-381, 561 F.2d at 378-379
 
 
 [31]
 Indeed, one of AT&T's stronger arguments against the Bell Telephone result is directly supportive of the result we reach here. In arguing that FX and CCSA should not be considered within the scope of Specialized Carrier, AT&T emphasized that FX and CCSA services were already being provided at the time by AT&T and independent carriers, and that the FCC in Specialized Carrier was "contemplating other, more unique services." 503 F.2d at 1262. The Third Circuit did not find this dispositive, concluding that "(w)hile there is language in (Specialized Carrier ) indicating a concern with new, customized services, we interpret this language as referring not only to types of services provided, but also to the delivery of private line services to ultimate customers who theretofore had been unable to obtain private line services fashioned to their particular needs." Id. We need only point out that to the extent both AT&T and the Third Circuit recognized in Specialized Carrier a concern with and an interest in encouraging "new, customized service," that is a recognition which we share in finding that decision dispositive of MCI's right in theory and in practice to provide Execunet
 
 
 [32]
 See FCC Declaratory Ruling, Supra note 1, P 58; Response of Federal Communications Commission, Supra note 18, at 10-11, 20; AT&T Opposition, Supra note 17, at 19
 
 
 [33]
 FCC Declaratory Ruling, Supra note 1, P 53, Quoting MCI Telecommunications Corp., 60 FCC2d 25, 63 (1976)
 
 
 [34]
 See MCI Reply to Oppositions, Supra note 19, at 14