659 F.2d 1092
 212 U.S.App.D.C. 208
 The LINCOLN TELEPHONE and TELEGRAPH COMPANY, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
MCI Telecommunications Corporation, Intervenor.
 Nos. 79-1487, 79-2029, and 79-2310.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Nov. 25, 1980.
Decided Jan. 28, 1981.
 
 Petitions for Review of Orders of the Federal Communications commission.
 Thomas J. O'Reilly, Washington, D. C., for petitioner.
 Jack David Smith, Counsel, F. C. C., Washington, D. C., with whom Robert R. Bruce, Gen. Counsel, David J. Saylor, Deputy Gen. Counsel, and Daniel M. Armstrong, Associate Gen. Counsel, F. C. C., Sanford M. Litvack, Asst. Atty. Gen., and Barry Grossman and Andrea Limmer, Attys., Dept. of Justice, Washington, D. C., were on the brief, for respondents. John E. Ingle, Counsel, F. C. C., Washington, D.C., and John J. Powers, III and Susan J. Atkinson, Attys., Dept. of Justice, Washington, D. C., also entered appearances for respondents.
 William J. Byrnes, Washington, D. C., with whom Michael H. Bader, Kenneth A. Cox, and John M. Pelkey, Washington, D. C., were on the brief, for intervenor. John Wells King, Washington, D. C., also entered an appearance for intervenor.
 Shanler D. Cronk, Lincoln, Neb., was on the brief for amici curiae State of Nebraska and Nebraska Public Service Commission.
 Before WRIGHT, TAMM, and WILKEY, Circuit Judges.
 Opinion for the court filed by Circuit Judge J. SKELLY WRIGHT.
 J. SKELLY WRIGHT, Circuit Judge:
 
 
 1
 This case presents another chapter in the efforts of MCI Telecommunications Corporation (MCI) to serve the specialized communications market through the provision of Execunet telephone service. The petitioner here, Lincoln Telephone and Telegraph Company (LT&T), seeks review of three orders of the Federal Communications Commission (FCC) that relate to MCI's efforts to offer Execunet service in Lincoln, Nebraska.[1] In one order the FCC affirmed an earlier staff ruling that allowed MCI[2] to add 31 circuits between Lincoln and Omaha, Nebraska for the provision of Execunet service.[3] In another order the Commission required LT&T to interconnect its local exchange facilities with MCI's interstate facilities.[4] And in the third order the FCC ruled that LT&T could not delay such interconnection until MCI and LT&T reached agreement on rates; rather, LT&T was directed to provide immediate interconnection and charge interim rates set by the FCC which would be subject to later adjustment.[5] This order further directed LT&T to file with the FCC a tariff setting forth the company's charges and regulations for interconnection. In this petition for review LT&T argues that these actions taken by the Commission in the three orders were without authority under the Communications Act of 1934[6] and therefore unlawful. Finding little merit in the arguments made by LT&T, we affirm all three orders.
 
 I. BACKGROUND
 A. The Prior Execunet Decisions
 
 2
 MCI is in the specialized communications field. MCI offers, among other services, a form of long-distance telephone service, Execunet, that relies on a point-to-point microwave system.[7] MCI's initial efforts to offer Execunet service were the subject of three prior decisions by this panel.[8] See MCI Telecommunications Corp. v. FCC, 561 F.2d 365 (D.C.Cir.1977), cert. denied, 434 U.S. 1040, 98 S.Ct. 780, 54 L.Ed.2d 790 (1978) (Execunet I ); MCI Telecommunications Corp. v. FCC, 580 F.2d 590 (D.C. Cir.), cert. denied, 439 U.S. 980, 99 S.Ct. 566, 58 L.Ed.2d 651 (1978) (Execunet II ); MCI Telecommunications Corp. v. FCC, D.C. Cir. No. 75-1635 (May 11, 1978) (per curiam ) (Execunet III ).[9] Because these decisions set the stage for the current dispute, our narrative properly begins with them.
 
 
 3
 In 1971 the FCC announced its intention to determine in an overall proceeding "(w)hether as a general policy the public interest would be served by permitting the entry of new carriers in the specialized communications field (.)"[10] Three years later the Commission determined it would. See Specialized Common Carrier Services, 29 FCC2d 870, 920 (1971), aff'd sub nom. Washington Utilities & Transportation Comm'n v. FCC, 513 F.2d 1142 (9th Cir.), cert. denied, 423 U.S. 836, 96 S.Ct. 62, 46 L.Ed.2d 54 (1975) (Specialized Carrier). And based on Specialized Carrier the Commission subsequently granted facilities authorizations to carriers, such as MCI, to provide microwave communications services. In 1975, however, the FCC, at the request of American Telephone and Telegraph Company (AT&T), prevented MCI from offering Execunet service over its existing facilities.[11] The Commission ruled that MCI could offer only "private line services" over its existing facilities and that Execunet service was not such a "private line service."[12] In Execunet I this panel of this court reversed the FCC and held that MCI was entitled to offer Execunet service over its authorized lines.
 
 
 4
 Our decision in Execunet I did not, however, conclude the matter. Shortly after the Supreme Court denied certiorari in Execunet I,[13] AT&T announced its intention to cease providing any "additional" interconnections needed by MCI for provision of Execunet service. At the request of AT&T the FCC issued a declaratory ruling that AT&T had no obligation under the Commission's prior orders, the Communications Act, or Execunet I to provide the interconnections.[14] Seeking relief from the FCC's action, MCI returned to this court. In Execunet II we held that the FCC's declaratory ruling was inconsistent with the mandate of Execunet I, and we directed the FCC and AT&T to comply with that mandate.
 
 
 5
 Nevertheless, the matter was still not laid to rest. Only days after Execunet II was handed down an intervenor, United States Independent Telephone Association, filed a motion to stay the court's order. In Execunet III this panel denied the motion. We noted that the arguments advanced by the Association had previously been rehearsed and rejected in Execunet I and Execunet II.[15]
 
 B. The Current Dispute
 
 6
 The dispute in this case arises out of MCI's efforts to expand the availability of Execunet service to Lincoln, Nebraska. Since April of 1975 MCI has possessed authority to operate five circuits (i.e., five four-Kilohertz channels) between Lincoln and Omaha, Nebraska. No claim is made in the instant case that the FCC improperly granted MCI these facilities authorizations. Rather, it is MCI's efforts between 1978 and 1979 to supplement those facilities and offer Execunet service in Lincoln that constitute the focus of this dispute. In its petition for review[16] LT&T challenges the three FCC orders, detailed below, that enabled MCI to expand the availability of Execunet service to Lincoln, Nebraska.
 
 
 7
 1. Authorization to Lease 31 Additional Circuits
 
 
 8
 In March 1978 MCI filed an application with the FCC requesting 31 supplemental circuits between Lincoln and Omaha.[17] The request was granted by the Commission's Common Carrier Bureau on June 30, 1978, but was conditioned as to continued use on the outcome of the FCC proceedings in the MTS and WATS Market Structure Inquiry (CC Docket No. 78-72). These FCC proceedings address the question whether the public interest requires that provision of MTS (interstate message telephone service) and/or WATS (wide area telephone service), or their functional equivalents, such as Execunet service,[18] be "on a sole source basis (i.e., free from direct competition)."[19] Ten days after the Common Carrier Bureau granted MCI's application, LT&T filed a "Petition to Deny."[20] The company argued that MCI's application failed to show how authorization of supplemental facilities would serve the public interest.[21] Further, LT&T contended that the grant of the application could potentially result in diversion of revenues of $3,652,000 from LT&T.[22] The Common Carrier Bureau rejected LT&T's petition as moot, noting that MCI's application had already been granted.[23]
 
 
 9
 LT&T then sought and obtained Commission review of the Bureau's decision. In a Memorandum Opinion and Order under review here, the Commission affirmed that decision on several grounds. First, the Commission held, the Common Carrier Bureau had properly dismissed the petition as moot.[24] Second, by conditioning the facilities authorizations on the outcome of the MTS and WATS Market Structure Inquiry, LT&T obtained the relief which, according to the Commission, it had sought in the alternative.[25] Third, MCI's application adequately demonstrated how the public interest would be served by the grant of the application.[26] Fourth, the Commission made its own determination that the facilities authorizations would serve the public interest; it rejected LT& T's argument that the company would be injured economically, finding flaws in the economic projections LT&T had made.[27]
 
 2. LT&T's Obligation to Interconnect
 
 10
 In May of 1978, while its application for 31 supplemental circuits was still pending, MCI filed tariff revisions with the FCC to expand Execunet's availability to ten new cities, one of which was Lincoln, Nebraska. LT&T raised several objections to the tariff revisions insofar as they proposed to make Execunet service available in Lincoln.[28] One was that MCI would be unable to offer Execunet service in Lincoln because MCI had not arranged for local interconnections.[29] The Commission, however, in approving MCI's tariff revisions in its Memorandum Opinion and Order of August 18, 1978, ordered LT&T to provide MCI with local interconnections.[30] Lincoln challenges that aspect of the August order in its petition for review.
 
 
 11
 3. Declaratory Order Requiring Lincoln to Provide Immediate Interconnection
 
 
 12
 After the FCC issued its Memorandum Opinion and Order of August 18, 1978 the two companies began negotiations as to rates and terms for local interconnections. Unfortunately, they were unable to reach agreement, and MCI returned to the Commission in February 1979 to ask that the Commission take action to enforce its earlier interconnection order of August 18, 1978.[31] On July 11, 1979 the FCC issued a declaratory order requiring LT&T immediately to provide MCI with interconnections for Execunet service.[32] The order stated that until the two companies could reach agreement LT&T should "bill and collect the charges * * * set forth in the tariff filed by the Bell System Operating Companies pursuant to the ENFIA ([33] agreement," but subject to later adjustment.[34] The declaratory order also required LT&T to file with the FCC an interstate tariff detailing the charges and regulations for interconnection.[35] In its petition for review LT&T challenges the Commission's actions in setting interim rates and in requiring LT&T to file a tariff.
 
 II. THE MERITS
 A. The Supplemental Circuits
 
 13
 LT&T challenges the FCC's grant of authority to MCI to add 31 circuits between Lincoln and Omaha, Nebraska as improper under the Communications Act of 1934.[36] The telephone company argues that the Commission, by failing to make a finding that the additional circuits were required by the public interest, violated Section 214(a) of the Act.[37] Section 214(a) provides that before a common carrier can construct or operate any "new line" or "extension of any line" the carrier must obtain from the Commission "a certificate that the present or future public convenience and necessity require" the new or extended line.[38]
 
 
 14
 Lincoln's assertion that the Commission failed to make the public interest finding as required by Section 214(a) is entirely unfounded. In granting MCI's request for the 31 supplemental circuits the FCC stated:
 
 
 15
 23. In order to clarify the circumstances surrounding this application, however, we explicitly reaffirm and find that the public interest, convenience and necessity will be served by the automatic grant of NCCC's [MCI's subsidiary] supplemental application. The basis of our finding is our general policy favoring the authorization of specialized common carriers such as NCCC and our previous decision in exercise of that policy authorizing NCCC to operate the facilities in the Lincoln market that it now seeks to supplement. That policy was intended to govern individual requests for certification. Its application here, both to the original authorization to operate in Lincoln and to the supplemental facilities, is consistent with our purpose in the Specialized Carrier rulemaking.
 
 
 16
 24. LT&T argues, however, that the proposed use of these facilities to provide Execunet service should make a difference. LT&T concedes that the Execunet decisions in court lifted the service restrictions on the existing certificates of specialized carriers and left them free to offer Execunet and other non-private line services. But it contends that the Commission cannot now grant additional certificates to specialized carriers, knowing that they will be used for non-private line services, without first either finding specifically that each certificate will serve the public interest or completing its ongoing inquiry to determine the future market structure for public switched message telecommunications services. In the alternative, LT&T argues that the Commission must condition any grants it makes now on the outcome of the MTS/WATS inquiry.
 
 
 17
 25. In the wake of the Execunet decisions, the Commission adopted an interim policy of routinely processing Section 214 applications to permit necessary expansion of communications facilities without prejudging the ongoing further inquiry into MTS/WATS competition. Each grant was conditioned on the outcome of that inquiry to permit us later to conform existing facility authorizations with the industry structure we ultimately adopt. We chose this interim policy to govern Section 214 applications both because it afforded a practical approach to the undeniable demand and need for additional facilities and because it was consistent with the Execunet mandate. The Court in those decisions made clear that the Commission could not restrict the use of facilities to particular kinds of services unless and until it had found that the public interest required service restrictions. Since we had made no systematic assessment of the benefits and detriments of MTS/WATS competition, we were unable to restrict authorizations generally and these NCCC authorizations in particular in the manner that LT&T suggests.
 
 
 18
 26. The supplemental grants to NCCC were consistent with this interim processing policy, in that the Commission authorized necessary expansion of NCCC's facilities subject to a condition that will permit later restrictions on the use of those facilities if the MTS/WATS inquiry results in a finding that such restrictions would serve the public interest. We conclude once again, after due consideration of LT&T's argument, that our grant in this instance rests firmly upon our general public interest finding in the Specialized Carrier rulemaking, as construed by the courts, and upon our interim policy of granting conditional certificates consistent with the Execunet mandate. We thus reject LT&T's suggestion that we could not grant these applications without further proceedings.
 
 
 19
 N-Triple-C, Inc., Memorandum Opinion and Order, PP 23-26, 74 FCC2d 196, 201-203 (1979), reprinted in JA at 40-42 (first emphasis added; footnotes omitted). While it may be true that further amplification concerning the Commission's public interest finding might have been helpful, Section 214(a)'s requirement of a public interest finding was nonetheless satisfied. The Commission's finding of public interest in the instant case was supported by the record in this litigation and by logic, reason, and common sense. Section 214(a) requires no more.[39]
 
 
 20
 In response to the Commission's finding, Lincoln seems to make two arguments. First, the Commission must make an individualized finding of public interest whenever it grants a carrier authority under Section 214(a) to obtain a "new line" or "an extension of any line"; in other words, it cannot apply in individual cases the broad finding of public interest previously made in Specialized Carrier.[40] Second, the broad finding of public interest made in the Specialized Carrier decision does not apply to MCI's addition of 31 circuits between Omaha and Lincoln, Nebraska for provision of Execunet service.
 
 
 21
 The first argument that a broad finding of public interest cannot be subsequently relied on in later individual cases to satisfy Section 214(a)'s requirement of an affirmative finding of public interest was addressed by this court in American Tel. & Tel. Co. v. FCC, 539 F.2d 767 (D.C.Cir.1976). In that case this court reviewed the FCC's grant of a radio license to United States Transmission System, Inc. for certain new microwave radio stations. Under Section 309(a) of the Communications Act the FCC is required to find that "the public interest, convenience, and necessity" will be served before it grants a radio license.[41] And under Section 309(e) a hearing must be held prior to such a finding whenever "a substantial and material question of fact is presented(.)"[42] The petitioner, AT&T, argued that the Commission, having treated Section 309's "public interest" requirement as satisfied by the Specialized Carrier decision, violated Section 309 by not holding an evidentiary hearing. The court rejected the argument:
 
 
 22
 (T)he Commission may obviate the need for repetitious hearings on previously considered issues of public policy by establishing, through rulemaking, criteria against which to judge specific applications. United States v. Storer Broadcasting Co., 351 U.S. 192, 202-205, 76 S.Ct. 763, 770-771, 100 L.Ed. 1081 (1956). In such cases a hearing is not required unless the party opposed to the adopted policies "set(s) forth reasons, sufficient if true, to justify a change or waiver of the (policies)." Id. at 205, 76 S.Ct. at 772. As the Ninth Circuit stated, in a somewhat different context, with regard to the Specialized Carriers rulemaking: "Though the Commission (in Specialized Carrier ) said it would pass separately upon the merits of each pending application, presumably the rule would govern individual cases. That is its function." Washington Utilities, 513 F.2d at 1164.
 
 
 23
 539 F.2d at 774-775 (second and third brackets in original; footnote omitted).
 
 
 24
 On the basis of American Tel. & Tel. Co. v. FCC one should properly conclude that the Specialized Carrier decision may be relied on in individual cases to satisfy the public interest requirement of Section 214(a).[43] It is true, of course, that American Tel. & Tel. Co. concerned Section 309. But Section 309 requires, in addition to a public interest finding, a hearing whenever "a substantial and material question of fact is presented." Section 214(a), on the other hand, only requires that the Commission issue a certificate of public interest; it makes no mention of any hearing requirement.[44] The case for applying the broad policy decision of Specialized Carrier to individual cases is therefore even stronger with respect to Section 214(a) than with respect to Section 309.
 
 
 25
 There is thus little doubt that the FCC may satisfy Section 214(a)'s requirement of a public interest finding through a single rulemaking proceeding.[45] Section 214(a) does not specify any particular procedure for making public interest determinations. And by not specifying the procedure to be employed, Congress allowed the Commission flexibility to mold its procedures to the needs of the situation. That is indeed what the Commission sought to do in the Specialized Carrier rulemaking proceeding. By 1970 the Commission was confronted with "a large number of applications * * * for authorization to construct and operate microwave and other facilities to provide specialized common carrier services * * * in various parts of the country."[46] Moreover, it was "anticipated that numerous additional applications for facilities of a similar nature (would) be forthcoming(.)"[47] The rulemaking conducted in Specialized Carrier permitted the Commission to resolve in one proceeding the many common issues that these applications presented. It was the view of the Commission that a single rulemaking proceeding "would be conducive to prompt, orderly and efficient disposition of these matters and * * * far preferable to decisions on them arrived at in the context of individual proceedings, and/or evidentiary hearings on each set of applications, or even a single consolidated hearing."[48]
 
 
 26
 This court is mindful, however, of the fact that individual applications under Section 214(a) may present specific factual questions not resolved in the Specialized Carrier rulemaking proceeding, and that the Commission will thus need to address them.[49] For example, in individual cases questions concerning the economic impact of the Section 214(a) authorization on the immediate parties,[50] the qualifications of the applicant, or the soundness of the proposed service may arise. Indeed, in the instant case LT&T argued that the grant of MCI's request for 31 supplemental circuits would divert revenues from LT&T. The Commission properly considered the claim, but found LT&T's economic projections to be based on "unlikely assumptions."[51]
 
 
 27
 LT&T's other argument seems to be that the broad policy recognized in Specialized Carrier does not apply to MCI's Execunet service. In support of its argument LT&T quotes[52] from this court's decision in Execunet I :
 
 
 28
 (W)e have not had to consider, and have not considered, whether competition like that posed by Execunet is in the public interest. That will be the question for the Commission to decide should it elect to continue these proceedings. * * *
 
 
 29
 561 F.2d at 380. To apply the broad policy decision of Specialized Carrier to Execunet service, LT&T suggests, "is to stand Execunet [I] on its head."[53] But in making its argument Lincoln mischaracterizes both the Commission's decision in Specialized Carrier and our own decision in Execunet I. Neither decision suggests that the broad policy recognized in Specialized Carrier favoring competitive entry in the specialized communications field does not include Execunet service. Rather, the Commission in Specialized Carrier did not define "specialized communications," or state whether the broad policy applied to provision of Execunet service, in particular. Nor was the question whether the policy applied to Execunet service presented to, or even answered by, this court in Execunet I.
 
 
 30
 In Execunet I this court reviewed several orders of the FCC that required MCI to cease offering Execunet service over its existing facilities. Most of MCI's authorizations to operate those facilities had previously been issued pursuant to the Specialized Carrier decision, in which the Commission had determined by rulemaking that "as a general policy the public interest would be served by permitting the entry of new carriers in the specialized communications field * * *." Specialized Carrier, supra, 29 FCC2d at 878. In defense of its orders barring Execunet the FCC argued that the broad policies recognized in Specialized Carrier did not apply to competition in other than private line areas, and that therefore MCI's authorizations to operate its existing facilities did not include Execunet service.[54]
 
 
 31
 This panel rejected the FCC's argument in Execunet I. We noted that Section 214(a) does not in any way restrict a common carrier from implementing new services over its existing facilities.[55] But as we pointed out, Section 214(c)[56] permits the Commission "to restrict the services that may be offered over a communication line once it is built, acquired, or extended."[57] Because Section 214(c) permits the Commission to impose such restrictions only after it "has affirmatively determined that 'the public convenience and necessity (so) require,' "[58] we concluded that the FCC's restrictions on MCI were an improper exercise of Section 214(c) authority:
 
 
 32
 (T)he Commission's Specialized Common Carrier decision cannot reasonably be read to have made an affirmative determination that the public convenience and necessity required "private line" restrictions on the facilities authorizations of specialized common carriers. * * *
 
 
 33
 Execunet I, supra, 561 F.2d at 379 (footnotes omitted).
 
 
 34
 Thus the Execunet I court decided only the narrow question whether Specialized Carrier included a finding that a "private line" restriction on Execunet service offerings was required by the public interest. The answer was it did not. The court was not confronted with, and did not decide, the question before this court in the instant case: whether Specialized Carrier's broad decision favoring entry in the specialized communications field applies to Execunet service.[59]
 
 
 35
 While Execunet I provides no help in deciding whether the broad policy decision of Specialized Carrier applies to Execunet service, Execunet II and Execunet III do offer assistance. In Execunet II this court was confronted with the argument by the FCC and AT&T that AT&T did not have to provide MCI with "additional" interconnections necessary for Execunet service. We rejected the argument:
 
 
 36
 In our view, then, the only conclusion to the issues presented here which is consistent with our reasoning and holding in Execunet is that the Commission decisions in Specialized Carrier and Bell System Tariff Offerings impose upon AT&T an obligation to provide interconnections for Execunet. * * *
 
 
 37
 580 F.2d at 597. In rejecting the argument we held, without explicitly stating, that Specialized Carrier's broad policy determination applied to Execunet service. For under Section 201(a) of the Communications Act[60] interconnections may be ordered by the Commission only after an affirmative public interest finding. The public interest finding necessary for our conclusion that AT&T was obligated to provide interconnections for Execunet must necessarily be found in Specialized Carrier.[61]
 
 
 38
 Lest there be any remaining doubts, Execunet III explicitly states what this court had done: "(W)e have construed Specialized Carrier to encompass Execunet service notwithstanding the * * * absence of specific references." Slip op. at 7, App. infra at 7.[62] In other words, despite the fact that the Commission in Specialized Carrier did not consider whether provision of Execunet service, in particular, was in the public interest, this court held in Execunet II and Execunet III that the broad policy recognized in Specialized Carrier applies to Execunet service.
 
 
 39
 Although this court included Execunet service within the scope of Specialized Carrier "notwithstanding the * * * absence of specific references," it nonetheless made clear that the Commission could examine in rulemaking or tariff proceedings whether particular services of specialized common carriers, such as MCI's Execunet, should be governed by the broad policy decision of Specialized Carrier. But until such proceedings concluded that provision of Execunet was not in the public interest, its development should not be limited. Thus in Execunet II this court noted that
 
 
 40
 Specialized Carrier represented a broad decision by the Commission to allow carriers such as MCI to enter the market and compete with AT&T, subject only to later limitations based on public interest determinations in tariff or rulemaking proceedings. * * *
 
 
 41
 580 F.2d at 597 (last emphasis added; footnote omitted). And in Execunet III this court again stressed that the Specialized Carrier decision
 
 
 42
 contemplated rulemaking and tariff review according to public interest standards as the exclusive mechanisms for imposing future controls on the development of specialized carriers such as MCI.
 
 
 43
 Slip op. at 3, App. infra at 4 (emphasis added). In the MTS and WATS Market Structure Inquiry, begun in 1978, the FCC initiated rulemaking proceedings to determine whether MTS and WATS, and their functional equivalents, such as Execunet,[63] should be provided on a "sole source basis" rather than be governed by Specialized Carrier's broad decision favoring entry in the specialized communications market.[64]
 
 
 44
 Judged against the background of these previous pronouncements by this court, it would have been understandable had the Commission in the instant case unconditionally granted MCI authority to lease the 31 additional circuits for provision of Execunet service. But it did not. Rather, the Commission pursued a far more cautious course of action: it conditioned its grant of authority on the outcome of the MTS and WATS Market Structure Inquiry. Contrary to LT& T's suggestion, the conditional grant did not "stand Execunet [I] on its head." Rather, the grant was entirely consistent with all of our prior decisions and the Commission's decision itself in Specialized Carrier. Indeed, had the Commission adopted LT&T's argument, it would have stood our decisions in Execunet II and Execunet III on their heads.
 
 B. LT&T's Obligation to Interconnect
 
 45
 Having rejected LT&T's argument concerning the supplemental circuits, we need say little about petitioner's argument that the Commission improperly ordered it to provide MCI with local interconnections necessary for provision of Execunet service. LT&T's argument is that the Commission failed to find that the interconnections would serve the public interest and that its order was therefore improper under Section 201(a).[65]
 
 
 46
 As our previous discussion explained, this court expressly held in Execunet II that AT&T was obligated to provide MCI with local interconnections for provision of Execunet service. The obligation we recognized was necessarily premised on the fact that in Specialized Carrier the FCC found such interconnections to be in the public interest. No different conclusion obtains in the instant case. While it is true that LT&T is an independent telephone company, Specialized Carrier directed "established carriers with exchange facilities" to provide new carriers, such as MCI, with interconnections.[66] LT&T is such an "established carrier." Just as we held in Execunet II that AT&T must provide MCI with interconnections necessary for Execunet service, we hold here that LT&T must provide such interconnections.
 
 
 47
 In recognizing LT&T's obligation to provide MCI with necessary local interconnections, the Commission pointed out that LT&T had first been given the opportunity to show "that provision of those facilities would result in damage to Lincoln's telephone system or would otherwise be contrary to the public interest."[67] LT&T attempted such a showing by presenting its own study that projected a diversion of revenues of $3,416,220 from the telephone company.[68] The Commission, however, held that LT&T had failed to make a proper showing of adverse impact:
 
 
 48
 Lincoln's claim of adverse impact sets forth a "worst case" situation and its study is based on several contentious assumptions. Specifically, the potential loss figure to Lincoln assumes that all customers in the Lincoln Telephone Common Switching Area and the remainder of Lincoln's service area whose toll charges to cities served by Execunet exceeded the minimum Execunet charge would subscribe to Execunet. This extensive subscribership has not happened in other cities served by Execunet and Lincoln has not given us reason to conclude that it would happen in this instance. Also, push-button telephones or separate tone generating devices are required to utilize Execunet. It cannot be assumed that all the potential Execunet customers designated by Lincoln have such equipment. To acquire it would add to the customer's cost of the service. Also, by including all the customers in its service area, Lincoln apparently does not account for the fact that Execunet would be available to all such customers through local service. Those customers outside the local exchange would be required to pay a toll charge to access MCI's facilities in Lincoln for the use of Execunet, thereby adding to their cost for the service. Finally, we question whether MCI has the intercity facilities from Lincoln to handle the amount of traffic Lincoln Telephone assumes will be diverted from its services. * * *
 
 
 49
 MCI Telecommunications Corp., Memorandum Opinion and Order, P 11, 68 FCC2d 1553, 1556-1557 (1978), reconsid. denied, FCC 78-884 (Jan. 3, 1979), reprinted in JA at 5 (footnote omitted). Although LT&T continues to argue that it made an adequate showing, we are of the view the Commission provided ample support for its rejection of the company's adverse impact claim.[69]
 
 
 50
 C. The Declaratory Order Requiring Immediate Interconnection
 
 
 51
 In its Declaratory Order of July 11, 1979, the Commission directed LT&T to provide MCI with local interconnections necessary for Execunet service "immediately and without further delay."[70] The Commission did so, at the request of MCI, because the two companies could not reach agreement on acceptable rates and terms for interconnection. In its petition for review LT& T argues that two ancillary actions taken by the Commission as part of the Declaratory Order were without authority under the Communications Act. First, the Commission directed LT&T "to bill and collect the charges that are set forth in the tariff filed by the Bell System Operating Companies pursuant to the ENFIA agreement."[71] Second, LT&T was required to file an interstate tariff with the Commission "setting forth its charges and regulations for interconnection."[72]
 
 
 52
 1. The Interim Billing and Collection System
 
 
 53
 LT&T contends that the Commission unlawfully prescribed rates by directing it to collect from MCI the charges set forth in the ENFIA agreement.[73] For its argument LT&T relies on Section 205(a) of the Communications Act,[74] which authorizes the FCC to prescribe rates:
 
 
 54
 (a) Whenever, after full opportunity for hearing, upon a complaint or under an order for investigation and hearing made by the Commission on its own initiative, the Commission shall be of opinion that any charge, classification, regulation, or practice of any carrier or carriers is or will be in violation of any of the provisions of this chapter, the Commission is authorized and empowered to determine and prescribe what will be the just and reasonable charge or the maximum or minimum, or maximum and minimum, charge or charges to be thereafter observed * * *.
 
 
 55
 LT&T argues that the Commission's action in the instant case did not constitute a lawful rate prescription under Section 205(a): first, Section 205(a) does not apply to cases where a rate is being established for the first time; second, it requires the Commission to find, after a hearing, that the existing rate "is or will be in violation" of the Communications Act.
 
 
 56
 We agree with LT&T that Section 205(a) did not give the Commission authority to establish an interim billing and collection arrangement. Nevertheless, we do not conclude, as LT&T does, that the Commission lacked authority for its action. LT&T's labeling of the Commission's action as a prescription of rates is a gross mischaracterization. The interim charges set by the Commission do not necessarily represent the compensation LT&T will receive for the interconnections provided prior to agreement between MCI and LT&T on acceptable rates and terms. Rather, the interim billing and collection arrangement that the Commission established was expressly made subject to later adjustment, when "just and reasonable" rates would be finally established.
 
 
 57
 Under Section 154(i) of the Communications Act[75] the Commission had authority to establish such an interim collection system.[76] Section 154(i) gives the FCC authority to "issue such orders, not inconsistent with this chapter, as may be necessary in the execution of its functions." The Commission's establishment of an interim billing and collection arrangement was both a helpful and a necessary step for the Commission to take in implementing its "immediate" interconnection order.[77] It is beyond dispute that a corporation can offer services or products only so long as it receives the funds necessary for its operations. Although MCI and LT&T could not agree on an acceptable rate for the local interconnections, the Commission's action ensured LT&T a continuing source of funds though not necessarily constituting the compensation ultimately to be received in return for provision of local interconnections.
 
 2. The Tariff Filing
 
 58
 LT&T also challenges the Commission's authority to require the telephone company to file an interstate tariff detailing the charges and regulations covering interconnection.[78] The respondents, the FCC and the United States, and intervenor MCI argue in response that this issue was not raised before the Commission and therefore cannot be raised in this appeal.[79] Finding no indication in the record that LT&T did raise the issue before the Commission, we must agree with the Government and MCI.[80]
 
 
 59
 Further, even if we assume that LT&T properly raised the argument before the Commission, we are of the view that it is untenable. In arguing that the Commission was without statutory authority for the tariff filing requirement, LT&T relies on Section 203(a) of the Communications Act.[81] That section provides:
 
 
 60
 Every common carrier, except connecting carriers, shall, within such reasonable time as the Commission shall designate, file with the Commission and print and keep open for public inspection schedules showing all charges for itself and its connecting carriers for interstate and foreign wire or radio communication * * *.
 
 
 61
 LT&T argues that the section was inapplicable in the instant case for two reasons: "1) provision of local exchange interconnection by Lincoln Telephone is not a common carrier communications service and 2) even if it were, Lincoln Telephone, a connecting carrier, is specifically exempt from the tariff filing requirement contained in Section 203 of the Act."[82] It therefore follows, LT&T contends, that the Commission lacked authority under Section 203(a) to require the telephone company to file an interstate tariff.
 
 
 62
 We can assume, without deciding, that LT&T is a connecting carrier for purposes of Section 203(a), and is therefore exempt from any tariff filing requirement that the section might otherwise impose. Section 203(a)'s terms do not, however, in any way suggest that the section provides the exclusive authority under which the Commission can require a tariff to be filed. Thus, while Section 203(a) did not grant the Commission the requisite authority for its action, Section 154(i) did.
 
 
 63
 The instant case was an appropriate one for the Commission to exercise the residual authority contained in Section 154(i) to require a tariff filing. In Specialized Carrier the Commission announced that "established carriers with exchange facilities should, upon request, permit interconnection or leased channel arrangements on reasonable terms and conditions to be negotiated with the new carriers * * *."[83] When the connecting carrier and the specialized carrier are not in direct competition, the terms and conditions for interconnection will likely be reasonable ones. But that is not so in the instant case. LT&T and MCI are not "willing partners in the provision of interstate services,"[84] but rather bitter rivals who are at loggerheads. It is in LT&T's interest to limit the competition posed by MCI, or any other specialized carrier. While we in no way mean to intimate that LT&T is attempting to set unreasonable terms and conditions, we do observe that LT& T's incentive to do so is great. The Commission properly perceived the need for close supervision and took the necessary course of action: it required LT&T to file an interstate tariff setting forth the charges and regulations for interconnection.[85]
 
 III. CONCLUSION
 
 64
 For the foregoing reasons, the three orders of the Federal Communications Commission under review are
 
 
 65
 Affirmed.
 
 
 66
 * APPENDIX
 
 United States Court of Appeals
 FOR THE DISTRICT OF COLUMBIA CIRCUIT
 September Term, 1977
 No. 75-1635
 
 67
 MCI TELECOMMUNICATIONS CORPORATION, MICROWAVE
 
 
 68
 COMMUNICATIONS, INC., AND N-TRIPLE-C INC., Petitioners
 
 
 69
 v.
 
 
 70
 FEDERAL COMMUNICATIONS COMMISSION AND UNITED STATES OF
 
 AMERICA, Respondents
 
 71
 AMERICAN TELEPHONE AND TELEGRAPH COMPANY, et al., INTERVENORS
 
 Filed May 11, 1978
 
 72
 Before WRIGHT, Chief Judge, and TAMM and WILKEY, Circuit Judges.
 
 ORDER
 PER CURIAM
 
 73
 Intervenor United States Independent Telephone Association has filed a motion for a further stay of this court's order of April 14, 1978. For the reasons stated in the attached per curiam, it is ORDERED that that motion is hereby denied.
 
 
 74
 Intervenor American Telephone and Telegraph Company has filed a motion for a temporary stay of this court's order of April 14, 1978 until May 12, 1978, to permit application to the Chief Justice of the United States. It is ORDERED that the motion of intervenor American Telephone and Telegraph Company is hereby granted.
 
 
 75
 It is FURTHER ORDERED that if the application is made at or before noon on May 12, 1978 the stay is extended until the Chief Justice acts.
 
 PER CURIAM:
 
 76
 The United States Independent Telephone Association (USITA), an intervenor in this action, has filed with this court a petition for a stay of the panel's unanimous decision of April 14, 1978 granting MCI Telecommunications Corporation's motion for an order directing compliance with our mandate in MCI Telecommunications Corp. v. FCC, 561 F.2d 365 (D.C.Cir.1977), cert. denied, 434 U.S. 1040, 98 S.Ct. 780, 54 L.Ed.2d 790 (1978) (Execunet I). See MCI Telecommunications Corp. v. FCC, 580 F.2d 590 (D.C.Cir.1978) (Execunet II). In seeking a stay USITA raises again the very same arguments unanimously rejected by this panel in Execunet I, which the Supreme Court declined to review, in Execunet II, and in the petitions for rehearing. These same arguments were raised as well in the suggestions for rehearing en banc filed by the Commission, AT&T, and USITA, which led not one judge on this court to request a vote on en banc consideration. See Rule 35(b), Fed.R.App.P. It is our view that this case has been amply litigated, and that the time has come for enforcement of our original mandate in Execunet I. USITA has not "made a substantial case on the merits," Washington Metropolitan Area Transit Comm'n v. Holiday Tours, Inc., 599 F.2d 841 (D.C.Cir.1977), nor has it demonstrated that there will be irreparable injury without a stay, or that a stay is necessary to serve the public interest and will not substantially harm the opposing parties in this proceeding,[1] id.; Virginia Petroleum Jobbers Ass'n v. FPC, 259 F.2d 921, 925 (D.C.Cir.1958). We therefore deny the petition for a further stay. In order to allow AT&T to seek a stay from the Circuit Justice, however, we hereby grant its motion for a temporary stay. But lest there be any confusion as to our views, we hereby set forth briefly, hopefully for the last time, the issues at stake in this case and the reasons why we believe the arguments raised once again here to be wholly without merit.
 
 
 77
 * The background of these proceedings is detailed at length in both the original opinion, Execunet I, supra, 561 F.2d at 367-373, and our recent opinion granting MCI's motion, Execunet II, supra, 580 F.2d at 592-594. What is involved is MCI's provision of Execunet service, whereby a subscriber making use of local AT&T-furnished interconnections at both ends of an MCI-furnished interstate line can reach any telephone in a distant city served by the MCI line. In the proceedings under review in Execunet I the Commission rejected MCI's tariff for Execunet service on the ground that its earlier decisions establishing the scope of MCI's facilities authorizations notably the Specialized Carrier decision, Specialized Common Carrier Services, 29 FCC2d 870 (1971), aff'd sub nom. Washington Utilities & Transportation Comm'n v. FCC, 513 F.2d 1142 (9th Cir.), cert. denied, 423 U.S. 836, 96 S.Ct. 62, 46 L.Ed.2d 54 (1975) did not encompass Execunet-type services. This court reversed unanimously, holding that MCI did have authority to provide Execunet service. We found that an affirmative determination to exclude certain services is necessary to restrict a carrier's facilities authorization, and that no such determination had been made in Specialized Carrier. In reaching this determination this court broadly construed the scope of the Specialized Carrier decision and emphasized that that decision contemplated rulemaking and tariff review according to public interest standards as the exclusive mechanisms for imposing future controls on the development of specialized carriers such as MCI.
 
 
 78
 Certiorari was denied in Execunet I on January 16, 1978. On the same day AT&T filed with the Commission a petition for a declaratory ruling that it was under no obligation to furnish the local connections necessary for MCI's provision of Execunet service. The Commission responded by issuing a declaratory ruling to that effect on February 23, leading MCI to request that this court grant a motion directing the FCC and AT&T to comply with the Execunet I mandate. Since the Commission's declaratory ruling undermined our Execunet I mandate, on April 14, 1978 we granted the motion directing compliance.
 
 
 79
 Our grant of MCI's motion for compliance was based on the clear and intentional inconsistency of the Commission's February 23 declaratory ruling with our opinion and decision in Execunet I. In its declaratory ruling the Commission framed the critical question as "a determination as to what services were explicitly excluded from consideration" in its earlier decisions, and concluded that Execunet service was so excluded. FCC Declaratory Ruling P 59 (emphasis in original). That is precisely the question, however, which was presented and determined in directly contradictory fashion by this court in Execunet I. In relying on the opposite conclusion to support its declaratory ruling the Commission, we found, had acted "in direct and explicit contradiction" to our Execunet I mandate. Execunet II, supra, 580 F.2d at 596. In addition, we found the Commission's interpretation of Specialized Carrier and its reliance on interconnection obligations effectively to limit the service offerings of MCI to be directly at odds with the basic themes of our Execunet I decision: that Specialized Carrier represented a broad decision by the Commission to allow carriers such as MCI to enter the market and compete with AT&T, subject only to later limitations based on public interest determinations in tariff or rulemaking proceedings." Id. at 597. Finally, we addressed and rejected the argument that the Commission's position in its declaratory ruling was mandated by the Third Circuit's decision in Bell Telephone Co. of Pennsylvania v. FCC, 503 F.2d 1250 (3d Cir. 1974), cert. denied, 422 U.S. 1026, 95 S.Ct. 2620, 45 L.Ed.2d 684 (1975), finding our decision to be wholly consistent with and indeed deriving support from that reached by the Third Circuit in Bell Telephone.
 
 
 80
 Subsequently, we granted a stay of our order pending disposition of the petitions for rehearing and suggestions for rehearing en banc to afford the Commission and AT&T the fullest opportunity to press their claim. Extensive petitions for rehearing and suggestions for rehearing en banc were then filed by the FCC and AT&T, as well as by USITA. We unanimously denied the petitions for rehearing on May 8, 1978. Rehearing en banc was denied on the same day, with no judge on this court having requested a vote on the suggestions. See Rule 35(b), Fed.R.App.P.
 
 II
 
 81
 In seeking a stay of our order, USITA continues to stress the two points which have been emphasized throughout these proceedings: that the interconnection obligation of AT&T was neither mentioned nor addressed in Execunet I, and that Execunet II is inconsistent with the Third Circuit's decision in Bell Telephone Co. of Pennsylvania v. FCC, supra.
 
 
 82
 As to the first point, the fact is that until the Supreme Court denied certiorari in Execunet I AT&T provided the interconnections necessary for Execunet service without any form of protest or objection. The obligation of AT&T as a common carrier to provide the necessary interconnections was conceded all through the Execunet I proceedings, and they were indeed so provided. In securing the modification of our original stay of the Commission's ruling in Execunet I, in its briefs and arguments to this court, and in its petition for certiorari, AT&T repeatedly and consistently stressed that a decision in favor of MCI would lead to further expansion and vigorous and adverse competition a result which could occur only if AT&T was required to provide the necessary interconnections. It was only after the Supreme Court's denial of certiorari and only a few hours afterwards, at that that AT&T claimed for the first time that it was not required to provide interconnection for Execunet service. It was thus that we concluded in Execunet II that our decision in Execunet I, consistent with AT&T's representations during those proceedings, clearly contemplated that AT&T was and is required to provide interconnection with Execunet service. 580 F.2d at 595. Nonetheless, our grant of MCI's motion was not based on any abstract contemplation of the court, let alone on the private intentions of the members of the panel. See AT&T Petition for Rehearing at 11. Rather, it was grounded on the very clear and concrete contradictions between the court's reasoning, interpretations, and conclusions in Execunet I and those of the Commission in its declaratory ruling. The fact that interconnection obligations were not specifically addressed in Execunet I because they were assumed by the parties hardly eliminates these contradictions; if anything, it provides further support for the grant of MCI's motion to direct compliance with this court's mandate.
 
 
 83
 The argument for a further stay of our mandate based on the alleged inconsistency with Bell Telephone is, we think, no more persuasive. Indeed, in Bell Telephone the court held that AT&T was required to provide interconnection for services similar to, though somewhat more limited, than Execunet. The court reached this conclusion by broadly construing the Commission's Specialized Carrier decision to include the services in question, notwithstanding the absence of any explicit mention of them in the Commission decision just as we have construed Specialized Carrier to encompass Execunet service notwithstanding the similar absence of specific references. Certainly, no one could argue that a decision by one court that AT&T is required to provide interconnection for one service forecloses a subsequent decision that AT&T is also required to provide interconnection for a similar service which makes use of identical forms of interconnection.
 
 
 84
 There is, then, absolutely no inconsistency between the holdings of Bell Telephone and Execunet I and II. The only inconsistency even asserted derives instead from the Third Circuit's reasoning in rejecting AT&T's argument that the interconnection order under review in Bell Telephone, which required AT&T to provide interconnections "essential to the rendition of all of (the specialized carriers') presently or hereafter authorized interstate and foreign communications services," imposed an "unbounded " and illegal interconnection obligation. Bell Telephone, supra, 503 F.2d at 1273, 1283. In response the court noted that while the order on its face gave little guidance as to the types of services that AT&T will be required to provide "hereafter," when read in context "the FCC has required AT&T to provide to the specialized carriers those interconnection elements of private line services which AT&T supplies its affiliates and furnishes to customers through its Long Lines Department." Id. at 1273-1274. Relying on this statement, AT& T argues that its interconnection obligations are limited by the Third Circuit decision to "private line" services and that Execunet is not such a service.
 
 
 85
 But as the FCC has recognized in its declaratory ruling, the Third Circuit's use of the term "private line" cannot be interpreted to limit the interconnection obligations arising from Specialized Carrier to "private line services" as that term is currently defined. Rather, the Commission has explained the court's use of the term as a shorthand or abbreviated expression encompassing a broader range of services than that which the Commission currently defines as private line services. See FCC Declaratory Ruling, supra, at P 59; Execunet II, supra, 580 F.2d at 600. The relevant question, then, according to the Commission itself, is what services were explicitly excluded from consideration in Specialized Carrier and the decisions which followed it. The Bell Telephone case answered this question with respect to the services at issue in that case, but it did not address it, let alone answer it, with respect to Execunet services. That was the issue we addressed and decided in Execunet I. And it is the Commission's rejection of the answer we provided in Execunet I which necessitated our grant of MCI's motion to direct compliance.
 
 III
 
 86
 Only one point remains to be addressed. USITA emphasizes, as did the Commission and AT&T in their suggestions for rehearing en banc, that it is the responsibility of the Commission to determine whether competition by services such as Execunet is in the public interest. With that point we are in complete agreement. Recognition of the Commission's public interest responsibilities, however, provides no basis for upholding its February 23 declaratory ruling in view of the clear inconsistencies with the Execunet case. For the Commission's declaratory ruling was not based on considerations of the public interest, and it in no way reflected a Commission decision that expansion of Execunet service would adversely affect the public interest. Rather, it reflected only the Commission's interpretation of the statutory provisions of the Communications Act and of earlier decisions rendered by the Commission, the Third Circuit, and, most importantly, this court in Execunet I. Indeed, it was the Commission's prohibition of Execunet service without any consideration of the public interest in the first instance which led to this long series of litigation.
 
 
 87
 The Commission has now commenced inquiry into the broad questions of competition and the public interest posed by the development of services such as Execunet. That inquiry is one which we welcome. How long it will take is another question. But its existence does not justify allowing AT&T to maintain its de facto monopoly pending any final rules where this court has held, in a full proceeding between these parties, that consideration of the provisions of the Communications Act and of the relevant agency and judicial precedents establishes MCI's right to enter the market now.[2]
 
 
 88
 The decisions reached by this court have been informed by full briefing and argument in Execunet I and by voluminous submissions by the parties in Execunet II. The parties have been afforded ample opportunities to present their positions to this court, and to the Supreme Court in their petitions for review of Execunet I. Our decision in Execunet II simply enforces the mandate of Execunet I, which the Supreme Court chose not to review.
 
 
 
 [1]
 MCI intervened in support of the FCC's orders
 
 
 [2]
 A subsidiary of MCI, N-Triple-C, Inc., was the actual party covered by the order. For the purposes of this opinion, however, "MCI" will be used to refer to either the parent corporation or any of its subsidiaries
 
 
 [3]
 N-Triple-C, Inc., Memorandum Opinion and Order, 74 FCC2d 196 (1979), reprinted in Joint Appendix (JA) at 33
 
 
 [4]
 MCI Telecommunications Corp., Memorandum Opinion and Order, 68 FCC2d 1553 (1978), reconsid. denied, FCC 78-884 (Jan. 3, 1979), reprinted in JA at 1, 19 respectively
 
 
 [5]
 Lincoln Telephone & Telegraph Co., Declaratory Order, 72 FCC2d 724 (1979), reprinted in JA at 22
 
 
 [6]
 47 U.S.C. §§ 151-609 (1976 & Supp. III 1979)
 
 
 [7]
 With Execunet a subscriber using any push-button telephone (or rotary dial phone and tone generator) can reach any telephone in a distant city served by MCI simply by dialing a local MCI number followed by an access code and the number in the distant city. Execunet customers are billed for each call on a time and distance basis, subject to a monthly minimum
 MCI Telecommunications Corp. v. FCC, 561 F.2d 365, 367 (D.C. Cir. 1977), cert. denied, 434 U.S. 1040, 98 S.Ct. 780, 54 L.Ed.2d 790 (1978)(Execunet I ).
 
 
 [8]
 At the request of respondents, the FCC and United States, and intervenor MCI, and with no objection from LT&T, the instant case, which is so intimately connected with the prior decisions, was assigned to the same panel
 
 
 [9]
 Because the per curiam opinion issued by this panel in Execunet III was inadvertently never published, we reproduce it here as the Appendix to this opinion
 
 
 [10]
 Specialized Common Carrier Services, Notice of Inquiry to Formulate Policy, Notice of Proposed Rule Making, and Order, 24 FCC2d 318, 327 (1970)
 
 
 [11]
 The Commission did so by denying MCI's tariff "insofar as it purport(ed) to offer Execunet service(.)" MCI Telecommunications Corp., FCC 75-799 (July 2, 1975) (letter order) (reproduced in Appendix B of MCI Telecommunications Corp., 60 FCC2d 25, 62-64 (1976)). The tariff mechanism by which the Commission regulates "the practices of existing carriers using existing facilities," Execunet I, supra note 7, 561 F.2d at 374 n.44 (emphasis in original), is set forth in §§ 203-205 of the Communications Act of 1934, 47 U.S.C. §§ 203-205 (1976)
 
 
 [12]
 The Commission's rules define "private line service" as
 (a) service whereby facilities for communication between two or more designated points are set aside for the exclusive use or availability for use of a particular customer and authorized users during stated periods of time.
 
 
 [47]
 C.F.R. § 21.2 (1979). In contrast, a "public message service" is
 (a) service whereby facilities are offered to the public for communication between all points served by a carrier or by interconnected carriers on a non-exclusive message by message basis, contemplating a separate connection for each occasion of use.
 Id.
 
 
 [13]
 434 U.S. 1040, 98 S.Ct. 780, 54 L.Ed.2d 790 (1978)
 
 
 [14]
 American Tel. & Tel. Co., Memorandum Opinion and Order, 67 FCC2d 1455 (1978)
 
 
 [15]
 MCI Telecommunications Corp. v. FCC, D.C. Cir. No. 75-1635 (May 11, 1978) (per curiam ), slip op. at 1, Appendix (App.) infra at 2
 
 
 [16]
 LT&T's petition for review was originally filed in the Eighth Circuit, but upon motion it was transferred to this circuit in view of this court's three prior Execunet decisions
 
 
 [17]
 Informal Application Filed Pursuant to Section 63.03 of Part 63 of the Rules and Regulations of the Commission, N-Triple-C, Inc., FCC File No. W-P-C-1923 (March 29, 1968), reprinted in JA at 97
 
 
 [18]
 The FCC has determined that "Execunet has all the essential characteristics of MTS * * * (rather than) the essential characteristics of private line service(.)" MCI Telecommunications Corp., 60 FCC2d 25, 43 (1976), rev'd on other grounds, 561 F.2d 365 (D.C. Cir. 1977), cert. denied, 434 U.S. 1040, 98 S.Ct. 780, 54 L.Ed.2d 790 (1978). For purposes of this opinion we assume, without deciding, that Execunet is in fact a functional equivalent of MTS
 
 
 [19]
 MTS and WATS Market Structure, Notice of Inquiry and Proposed Rulemaking, 67 FCC2d 757, 757 (1978)
 
 
 [20]
 Petition to Deny, N-Triple-C, Inc., FCC File No. W-P-C-1923 (July 10, 1978), reprinted in JA at 67
 
 
 [21]
 Id. at 3-4, JA 69-70
 
 
 [22]
 Id. at 4-5, JA 70-72
 
 
 [23]
 Letter from Charles R. Cowan, Chief, Facilities & Services Division, FCC, to Charles P. Arnold, Vice President-Customer Services, LT&T (July 27, 1978), reprinted in JA at 44
 
 
 [24]
 N-Triple-C, Inc., supra note 3, P 15, 74 FCC2d at 200, JA 38. In ruling that the petition was moot, the Commission held that the application had been automatically granted under 47 C.F.R. § 63.03 (1979) on April 19, 1978, the 21st day following its filing, rather than on June 30, 1978, the day the application was stamped "granted." Since our decision does not turn on the "mootness" issue, we express no opinion concerning the correctness of the Commission's determination. Nor do we reach the question whether MCI's application was properly subject to the "automatic grant" procedure of § 63.03. See note 36 infra
 
 
 [25]
 N-Triple-C, Inc., supra note 3, P 18, 74 FCC2d at 200, JA 38. The Commission, however, mischaracterized LT&T's Petition to Deny. LT&T requested that the Commission deny MCI's application. It did not seek as relief in the alternative that the Commission condition its grant of the application on the outcome of the MTS and WATS Market Structure Inquiry. Rather, LT&T suggested that "if * * * the Commission should decide to authorize the( ) additional facilities," the Commission's grant "should be conditioned upon the outcome of the MTS and WATS Market Structure proceeding." Petition to Deny, supra note 20, P 9, at 7, JA 73 (first emphasis added)
 
 
 [26]
 N-Triple-C, Inc., supra note 3, P 3, 74 FCC2d at 201-202, JA 40
 
 
 [27]
 Id. PP 27-28, 74 FCC2d at 203, JA 42-43
 
 
 [28]
 See Petition for Suspension and Investigation of Tariff Filing (MCI Transmittal No. 88), MCI Telecommunications Corp. (May 30, 1978), reprinted in JA at 46. Those parts of the tariff revisions relating to the expansion of Execunet to cities other than Lincoln are not under review here. AT&T, which also opposed MCI's tariff revisions, did not file a petition for review
 
 
 [29]
 Id. at 4, JA 49. LT&T also raised the argument that MCI's expansion of Execunet service to Lincoln would cause economic injury to LT&T. In support of the argument the telephone company described a study conducted by its Revenue Requirements Department concluding that $3,416,220 in revenues would be diverted from LT&T as a result of MCI's provision of Execunet service in Lincoln, Nebraska. See id. at 4-5, JA 49-50. This same study, but with an amended estimate of $3,652,000, was presented in support of LT&T's "Petition to Deny" MCI's application for 31 supplemental circuits. See Petition to Deny, supra note 20, at 4-5, JA 70-71
 
 
 [30]
 MCI Telecommunications Corp., supra note 4, P 14, 68 FCC2d at 1558, JA 6-7
 
 
 [31]
 See Letter from William J. Byrnes, counsel for MCI, to Joseph A. Marino, Managing Counsel, Compliance and Litigation Task Force, FCC (Feb. 15, 1979), reprinted in JA at 136
 
 
 [32]
 Lincoln Telephone & Telegraph Co., supra note 5
 
 
 [33]
 The ENFIA agreement, see Exchange Network Facilities for Interstate Access (ENFIA), Memorandum Opinion and Order, 71 FCC2d 440 (1979), was a complex settlement reached by certain specialized carriers and telephone companies concerning compensation for local interconnections used by the specialized carriers "in providing MTS/WATS-'like' service to the public." Id. at 441. LT&T was not a party to the agreement
 
 
 [34]
 Lincoln Telephone & Telegraph Co., supra note 5, PP 13-14, 72 FCC2d at 728-729, JA 28-29. The Commission stated that "(t)he interim billing and collection arrangement will be subject to adjustment either on the basis of any ultimate agreement among the parties that the Commission approves or when the Commission has prescribed or determined just and reasonable charges." Id. P 14, 72 FCC2d at 728-729, JA 29
 
 
 [35]
 Id. P 13, 72 FCC2d at 728, JA 28-29. This obligation is, of course, to continue after MCI and LT&T reach agreement on permanent rates and conditions; the tariff filing will at that time detail charges and regulations that are likely to differ from those set forth in the ENFIA agreement, see note 33 supra
 
 
 [36]
 LT&T also argues that the Commission's grant was improper under the FCC's own regulations. In its Memorandum Opinion and Order of October 31, 1979 the Commission stated that, pursuant to 47 C.F.R. § 63.03 (1979), the application had been automatically granted 21 days after being filed. See note 24 supra. It is LT&T's contention, though, that MCI's application involved "(a) new or modified service" and thus, under the very terms of § 63.03, was not properly subject to "automatic grant." See 47 C.F.R. § 63.03(a) (1979) ("Excluded from consideration under this section are applications that would involve * * * (a) new or modified service * * *."). In our view the issue is wholly irrelevant to the propriety of the Commission's grant of authority to MCI to lease 31 supplemental circuits. If, as LT&T argues, § 63.03 was inapplicable, the application was then not automatically granted on the 21st day following its filing, but rather granted at a later date either when the Commission's Common Carrier Bureau stamped it "granted" on June 30, 1978 or when the Commission ruled in its Memorandum Opinion and Order that the application had been properly granted. The actual timing of the grant, however, plays no role in our decision announced today. Thus we decline to reach the question whether § 63.03 was applicable to MCI's application
 
 
 [37]
 Brief for petitioner at 24-27
 
 
 [38]
 The section reads in relevant part:
 No carrier shall undertake the construction of a new line or of an extension of any line, or shall acquire or operate any line, or extension thereof, or shall engage in transmission over or by means of such additional or extended line, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity require or will require the construction, or operation, or construction and operation, of such additional or extended line * * *.
 47 U.S.C. § 214(a) (1976).
 
 
 [39]
 Indeed, it is not even clear whether § 214(a) required the Commission to make a public interest finding in the instant case. A proviso to § 214(a) states that "the Commission may, upon appropriate request being made, authorize * * * the supplementing of existing facilities, without regard to the provisions of (§ 214)." It is true that MCI styled its application as a "Request for Authority to Supplement Existing Facilities Involving Leased Cost Not Exceeding $100,000," see JA at 98, and that the Commission labeled it a "Section 214 application for supplemental facilities," N-Triple-C, Inc., supra note 3, P 12, 74 FCC2d at 199, JA 37; see id. P 20, 74 FCC2d at 201, JA 29. Nonetheless, we express no opinion as to the applicability of the proviso since none of the parties argued or briefed the issue. Rather, we treat MCI's request for 31 "supplemental" circuits as subject to § 214(a)'s requirement of an affirmative public interest finding by the Commission
 
 
 [40]
 It is not entirely clear whether LT&T actually intended to make this argument. See brief for petitioner at 26-28; reply brief for petitioner at 7-8. We nevertheless address this argument so as to make it entirely clear that the Commission's action in the instant case did not violate § 214(a) of the Communications Act of 1934
 
 
 [41]
 Section 309(a) provides in relevant part:
 (T)he Commission shall determine * * * whether the public interest, convenience, and necessity will be served by the granting of such application, and, if the Commission, upon examination of such application and upon consideration of such other matters as the Commission may officially notice, shall find that public interest, convenience, and necessity would be served by the granting thereof, it shall grant such application.
 47 U.S.C. § 309(a) (1976).
 
 
 [42]
 47 U.S.C. § 309(e) (1976)
 
 
 [43]
 The Third Circuit's decision in Bell Telephone Co. v. FCC, 503 F.2d 1250 (3d Cir. 1974), cert. denied, 422 U.S. 1026, 95 S.Ct. 2620, 45 L.Ed.2d 684 (1975), provides similar support. In Bell Telephone AT&T challenged an FCC order that required the telephone company to provide MCI with interconnections needed for MCI's provision of Foreign Exchange (FX) service and Common Control Switching Arrangements (CCSA), two types of private line service. See note 12 supra. The Commission had based its order on the Specialized Carrier decision. One of AT&T's arguments was that under § 201(a) of the Communications Act, 47 U.S.C. § 201(a) (1976), the order was invalid since the Commission had failed to conduct a hearing before its issuance. Section 201(a) provides that the Commission may order common carriers to provide interconnections when, "after opportunity for hearing, (it) finds such action necessary or desirable in the public interest * * *." See note 60 infra. The court, after noting that "(n)on-evidentiary rule-making permits broad participation in the decision-making process and enables an administrative agency to develop integrated plans in important policy areas," rejected the argument and held that the Specialized Carrier rulemaking satisfied § 201(a)'s requirement of a finding, "after opportunity for hearing," of affirmative public interest. Bell Telephone Co. v. FCC, supra, 503 F.2d at 1265. See also Washington Utilities & Transportation Comm'n v. FCC, 513 F.2d 1142, 1164 (9th Cir.), cert. denied, 423 U.S. 836, 96 S.Ct. 62, 46 L.Ed.2d 54 (1975) ("When, as here, the issue is resolved by adoption of a general policy for uniform application in the regulation of a nationwide industry, rulemaking is an entirely appropriate means for 'a particularization of the Commission's conception of the "public interest" sought to be safeguarded by Congress in enacting the Communications Act of 1934.' ") (quoting Nat'l Broadcasting Co. v. United States, 319 U.S. 190, 218, 63 S.Ct. 997, 1010, 87 L.Ed. 1344 (1943))
 
 
 [44]
 See note 38 supra
 
 
 [45]
 Such an approach is in no way inconsistent with this court's opinion, written by Judge Wilkey, in Hawaiian Telephone Co. v. FCC, 498 F.2d 771 (D.C.Cir.1974). In that case an FCC order "granting authority to RCA Global Communications, Inc. * * * to provide private-line voice-only telephone service between the United States Mainland and Hawaii" was under review. Id. at 772. The court held the order invalid because the Commission had failed to satisfy § 214(a)'s requirement of an affirmative public interest finding. Although the FCC had found that the applicant's provision of additional services would increase competition, it had failed to show how the competition would "be of benefit to the public on the communication routes in question." Id. at 775. As the court noted, "(T)he FCC ha(d) given scant attention to the question of public convenience and necessity, and * * * ha(d) not met its statutorily imposed duty." Id. at 776. Hawaiian Telephone thus stands for the proposition that § 214(a) requires a finding of affirmative public interest rather than merely a finding of enhanced competition. Nothing in Hawaiian Telephone suggests that the FCC may not satisfy § 214(a)'s requirement of an affirmative public interest finding in individual cases through a single rulemaking proceeding
 
 
 [46]
 Specialized Common Carrier Services, supra note 10, 24 FCC2d at 318
 
 
 [47]
 Id
 
 
 [48]
 Id. at 318-319
 
 
 [49]
 See id. at 319; American Tel. & Tel. Co. v. FCC, 539 F.2d 767, 773-774 (D.C.Cir.1976)
 
 
 [50]
 We do not mean to suggest, however, that § 214(a) applications should be denied whenever their granting would cause economic injury to the immediate parties. In some cases the public interest may be served by the grant of the application despite economic injury to some of the parties. As we noted in Execunet I, "The ultimate test of industry structure in the communications common carrier field must be the public interest, not the private financial interests of those who have until now enjoyed the fruits of de facto monopoly." Execunet I, supra note 7, 561 F.2d at 380 (footnote omitted)
 
 
 [51]
 N-Triple-C, Inc. supra note 3, PP 27-28, 74 FCC2d at 203, JA 42-43. The Commission rejected the same economic injury claim in its Memorandum Opinion and Order of August 18, 1978, in which the FCC recognized LT&T's obligation to provide local interconnections. See text and notes at notes 67-68 infra. While LT&T challenges this aspect of the interconnection order, it does not challenge the "supplemental circuits" order insofar as the Commission rejected the economic injury claim
 
 
 [52]
 Reply brief for petitioner at 9
 
 
 [53]
 Id. at 7
 
 
 [54]
 The Commission had found Execunet service to be other than a private line service. See notes 12 & 18 supra
 
 
 [55]
 Execunet I, supra note 7, 561 F.2d at 375-376. As we noted, "The primary purpose of Section 214(a) is prevention of unnecessary duplication of facilities, not regulation of services. Because of this, Section 214 would appear to have a limited office with respect to regulation of service offerings on existing lines." Id. at 375 (emphasis in original; footnote omitted)
 
 
 [56]
 Section 214(c) provides in relevant part:
 The Commission shall have power to issue such certificate as applied for, or to refuse to issue it, or to issue it for a portion or portions of a line, or extension thereof, or discontinuance, reduction, or impairment of service, described in the application, or for the partial exercise only of such right or privilege, and may attach to the issuance of the certificate such terms and conditions as in its judgment the public convenience and necessity may require. * * *
 47 U.S.C. § 214(c) (1976).
 
 
 [57]
 Execunet I, supra note 7, 561 F.2d at 377
 
 
 [58]
 Id. (brackets in original)
 
 
 [59]
 The quotation from Execunet I on which Lincoln relies in making its argument, see text at notes 52-53 supra, demonstrates that very point that in Execunet I we never decided this question. But as the second sentence of that quotation indicates, the Commission did not make clear in Specialized Carrier which particular services provided by specialized carriers, such as MCI, were covered by the broad policy the Commission recognized. The failure of the Commission to make explicit the scope of the decision does not mean, however, that the broad decision favoring entry in the specialized communications field was not to be applied to Execunet service until the Commission further defined the scope of Specialized Carrier. Rather, as we subsequently discuss in text, this court has held that the broad policy decision contained in Specialized Carrier should be applied to Execunet service until the Commission, through tariff or rulemaking proceedings, removes that service from the scope of Specialized Carrier
 
 
 [60]
 Section 201(a) provides:
 (a) It shall be the duty of every common carrier engaged in interstate or foreign communication by wire or radio to furnish such communication service upon reasonable request therefor; and, in accordance with the orders of the Commission, in cases where the Commission, after opportunity for hearing, finds such action necessary or desirable in the public interest, to establish physical connections with other carriers, to establish through routes and charges applicable thereto and the divisions of such charges, and to establish and provide facilities and regulations for operating such through routes.
 47 U.S.C. § 201(a) (1976).
 
 
 [61]
 The obligation recognized by the court was based on the FCC's § 201 order in Bell System Tariff Offerings, 46 FCC2d 413 (1974), aff'd sub nom. Bell Telephone Co. v. FCC, supra note 43. There the FCC ordered AT&T to provide MCI with interconnections necessary for all services "presently or hereafter authorized" by Specialized Carrier. 46 FCC2d at 438. In Execunet II, however, the FCC and AT&T argued that this order did not comprehend interconnections necessary for Execunet service; the order in Bell System Tariff Offerings, according to the two parties, was limited to interconnections for private line services. See MCI Telecommunications Corp. v. FCC, 580 F.2d 590, 596 (D.C.Cir.), cert. denied, 439 U.S. 980, 99 S.Ct. 566, 58 L.Ed.2d 651 (1978) (Execunet II ). Indeed, the FCC had issued a declaratory ruling, at the request of AT&T, to that effect. See American Tel. & Tel. Co., supra note 14, P 58, 67 FCC2d at 1473
 The public interest finding supporting the § 201 order in Bell System Tariff Offerings was, however, made by the Commission in Specialized Carrier. See Bell System Tariff Offerings, supra, 46 FCC2d at 419; Bell Telephone Co. v. FCC, supra note 43, 503 F.2d at 1270-1271. The proceedings and interconnection order in Bell System Tariff Offerings "merely represent(ed) the Commission's method of enforcing (the) previously announced mandate" of Specialized Carrier. Bell Telephone Co. v. FCC, supra note 43, 503 F.2d at 1259. In fact, as part of its broad decision in Specialized Carrier the Commission directed "established carriers with exchange facilities * * * (to) permit interconnection or leased channel arrangements on reasonable terms and conditions to be negotiated with the new carriers * * *." Specialized Common Carrier Services, 29 FCC2d 870, 940 (1971), aff'd sub nom. Washington Utilities & Transportation Comm'n v. FCC, supra note 43. Thus the public interest finding necessary for the interconnection obligation this court recognized in Execunet II is found, not in Bell System Tariff Offerings, but rather in Specialized Carrier.
 
 
 [62]
 In so holding this court made it clear that the broad policy decision contained in Specialized Carrier is not limited to private line services. See also American Tel. & Tel. Co., supra note 14, 67 FCC2d at 1474 ("the Specialized Carrier decision encompassed specialized communications services other than those which theretofore had been described by the established carriers as 'private line' services")
 
 
 [63]
 See note 18 supra
 
 
 [64]
 See MTS and WATS Market Structure, supra note 19, 67 FCC2d at 757-758. As the Commission pointed out, these proceedings "were designed in part to give the opponents of competition in interstate services another opportunity to present arguments which were not considered in 1971." MTS and WATS Market Structure, Report and Third Supplemental Notice of Inquiry and Proposed Rulemaking, FCC 80-463 (Aug. 25, 1978), at 5
 
 
 [65]
 See note 60 supra. The State of Nebraska and the Nebraska Public Service Commission, filing a brief as amici curiae in the instant case, raise the additional argument that under the Constitution the FCC was required to conduct a "full hearing" before ordering LT&T to provide MCI with local interconnections. See brief of State of Nebraska and Nebraska Public Service Commission at 7. The amici fail, however, to isolate any provision in the Constitution supporting their argument. The Commission made the public interest findings necessary for its interconnection order in the Specialized Carrier rulemaking proceeding. Because recurring issues of public interest were being presented to the Commission, rulemaking was an appropriate and plainly constitutional method of resolving the matters in one proceeding. See text at notes 46-48 supra. Moreover, while the Commission did not hold a public hearing before recognizing LT&T's obligation to interconnect, it did consider the impact such an obligation would have on LT&T. See text and notes at notes 67-69 infra
 
 
 [66]
 Specialized Common Carrier Services, supra note 61, 29 FCC2d at 940
 
 
 [67]
 MCI Telecommunications Corp., supra note 4, 68 FCC2d at 1558, JA 7
 
 
 [68]
 See Petition for Suspension and Investigation of Tariff Filing (MCI Transmittal No. 88), supra note 28, at 4-5, JA 49-50
 
 
 [69]
 LT&T argues that "the Commission's expressions of skepticism * * * are demonstrably specious and wholly inconclusive." Brief for petitioner at 35. Unfortunately, LT&T fails to support its claim. LT&T argues that even if it does not make two of the challenged assumptions, $2,500,000 of its revenues attributable to customers in the City of Lincoln would nevertheless be diverted. Id. at 35-36. (The larger estimate of $3,416,220, which LT&T later increased to $3,652,000, see note 29 supra, was attributable to customers in the entire metropolitan area.) LT&T fails to show, however, that its most important assumption that all customers whose toll charges exceed the minimum Execunet charge will subscribe is any more true with respect to the City of Lincoln than with respect to the entire metropolitan area. As the Commission pointed out, such an assumption has not proven true in other cities. Thus the estimated diversion of revenues of $2,500,000 from customers in the City of Lincoln is no more reliable than the larger estimate of revenues diverted from customers in the entire metropolitan area
 LT&T also contends that because the Commission rejected its claim that over $3,000,000 in revenues would be diverted, the Commission had the burden to make "a reasoned and reasonable judgment of what it would expect to be the potential loss of revenue to Lincoln Telephone." Id. at 36. LT&T is wrong. Based on Specialized Carrier, the Commission properly concluded that interconnections necessary for MCI's provision of Execunet service would be in the public interest. LT&T attempted to show, as is its right, that it would be adversely injured by the interconnections. Once LT&T failed to make such a showing, however, the Commission assumed no burden to show how LT&T would in fact be financially affected. Cf. United States v. Storer Broadcasting Co., 351 U.S. 192, 205, 76 S.Ct. 763, 771, 100 L.Ed. 1081 (1956).
 
 
 [70]
 Lincoln Telephone & Telegraph Co., supra note 5, P 20, 72 FCC2d at 730, JA 31
 
 
 [71]
 Id. P 13, 72 FCC2d at 728, JA 28 (footnote omitted)
 
 
 [72]
 Id
 
 
 [73]
 Brief for petitioner at 37-40; reply brief for petitioner at 21-22
 
 
 [74]
 47 U.S.C. § 205(a) (1976)
 
 
 [75]
 Id. § 154(i)
 
 
 [76]
 The Supreme Court similarly relied on § 154(i) in approving the FCC's issuance of interim relief in United States v. Southwestern Cable Co., 392 U.S. 157, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968). The FCC had issued an order restricting the respondents' transmission of broadcast signals "pending appropriate hearings." Id. at 181, 88 S.Ct. at 2007. The respondents argued that § 312(b) of the Communications Act, 47 U.S.C. § 312(b) (1976), which covers cease and desist orders, did not give the FCC authority to issue the prohibitory order in question. While the Court conceded that § 312(b) was inapplicable, it nonetheless held that the Commission had the requisite authority for its action under § 154(i). See id. at 180 n.46, 88 S.Ct. at 2006 n.46. See also Trans Alaska Pipeline Rate Cases, 436 U.S. 631, 654-655, 98 S.Ct. 2053, 2066, 56 L.Ed.2d 591 (1978) (approving Interstate Commerce Commission's establishment of interim rate refund mechanism notwithstanding absence of express statutory authority)
 
 
 [77]
 Indeed, it is somewhat ironic that LT&T should even challenge this aspect of the order. The Commission devised an interim billing and collection arrangement for the very purpose of protecting LT&T's interest. Were we to agree with LT&T that the Commission lacked authority to establish this interim arrangement, then LT&T would be in the far worse position of having to provide MCI with interconnections while collecting nothing until a rate is finally agreed upon
 
 
 [78]
 Brief for petitioner at 41-43; reply brief for petitioner at 18-20
 
 
 [79]
 Brief for respondents at 40 n.32; brief for intervenor at 44; see 47 U.S.C. § 405 (1976) (petition for reconsideration is a condition precedent to judicial review "where the party seeking such review * * * relies on questions of fact or law upon which the Commission, or designated authority within the Commission, has been afforded no opportunity to pass")
 
 
 [80]
 LT&T asserts that it "consistently and repeatedly advised the Commission of its contract proposals to MCI, and pointed out that as a connecting carrier it had no tariffs on file with FCC." Reply brief for petitioner at 18 n.42. Providing such "advice" to the Commission is not, however, the same thing as raising the issue of the Commission's authority under the Communications Act to require the telephone company to file a tariff
 
 
 [81]
 47 U.S.C. § 203(a) (1976)
 
 
 [82]
 Brief for petitioner at 41-42
 
 
 [83]
 Specialized Common Carrier Services, supra note 61, 29 FCC2d at 940 (emphasis added)
 
 
 [84]
 Brief for respondents at 43
 
 
 [85]
 The amici curiae, State of Nebraska and Nebraska Public Service Commission, argue that because the FCC lacks jurisdiction over intrastate communication, see 47 U.S.C. § 152(a) (1976), the Commission lacked authority to require LT&T, a carrier all of whose facilities are located in the State of Nebraska, to file a tariff. The courts, however, have never adopted such a narrow view of the Commission's jurisdiction. Rather, those facilities or services that substantially affect provision of interstate communication are not deemed to be intrastate in nature even though they are located or provided within the confines of one state. See, e.g., Idaho Microwave, Inc. v. FCC, 328 F.2d 556 (D.C.Cir.1964); North Carolina Utilities Comm'n v. FCC, 552 F.2d 1036, 1044-1048 (4th Cir.), cert. denied, 434 U.S. 874, 98 S.Ct. 222, 54 L.Ed.2d 154 (1977); North Carolina Utilities Comm'n v. FCC, 537 F.2d 787 (4th Cir.), cert. denied, 429 U.S. 1027, 97 S.Ct. 651, 50 L.Ed.2d 631 (1976). The interconnections provided to MCI do substantially affect provision of interstate communication, that of Execunet, and are thus subject to the jurisdiction of the FCC
 
 
 [1]
 Indeed, the Department of Justice, in opposing the FCC's grant of AT& T's petition for a declaratory ruling which led to our Execunet II decision, emphasized that "AT&T totally failed to make any factual showing of harm in its petition to invoke Commission protection against competition in the intercity services market." See Comments of the United States Department of Justice, In the Matter of Petition of American Telephone and Telegraph Company for Declaratory Ruling and Expedited Relief, submitted as Appendix A to MCI Reply to Oppositions, MCI Telecommunications Corp. v. FCC (March 9, 1978), at 7. AT&T and the FCC have yet to make such a showing, or to demonstrate in any way that the public interest would be adversely affected by expansion of Execunet service
 
 
 [2]
 Indeed, FCC Commissioner Joseph R. Fogarty, who dissented from both the Commission's declaratory ruling in favor of AT&T and its decision to seek a stay and rehearing by this court, stated: "I believe it is improper and counterproductive to continue this litigation any further, following two reversals by the Court of Appeals and denial of review by the Supreme Court. Enough is enough. I would devote all available resources of this Commission to expedite determination of a reasonable competitive market structure for domestic telecommunications services." Statement of Commissioner Joseph R. Fogarty, In re Motion for a Stay of the United States Court of Appeals Order Directing Compliance with Execunet Mandate, submitted as Attachment A to MCI Oppositions to Stay, at 1